**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────────

**No. 12-1514**

─────────────────

NATIONAL LABOR RELATIONS BOARD,

       Petitioner,

     v.

ENTERPRISE LEASING COMPANY SOUTHEAST, LLC,

       Respondent.

─────────────────

On Application for Enforcement of an Order of the National Labor
Relations Board.  (11-CA-73779)

─────────────────

**No. 12-2000**

─────────────────

HUNTINGTON INGALLS INCORPORATED,

       Petitioner,

     v.

NATIONAL LABOR RELATIONS BOARD,

       Respondent,

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS,

       Intervenor.

------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
COALITION FOR A DEMOCRATIC WORKPLACE; AMERICAN HOTEL &

LODGING ASSOCIATION; HR POLICY ASSOCIATION; INTERNATIONAL FOODSERVICE DISTRIBUTORS ASSOCIATION; NATIONAL ASSOCIATION OF MANUFACTURERS; NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS; SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Amici Supporting Petitioner.

—————

**No. 12-2065**

—————

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS,

Intervenor,

v.

HUNTINGTON INGALLS INCORPORATED,

Respondent.

-----------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; COALITION FOR A DEMOCRATIC WORKPLACE; AMERICAN HOTEL & LODGING ASSOCIATION; HR POLICY ASSOCIATION; INTERNATIONAL FOODSERVICE DISTRIBUTORS ASSOCIATION; NATIONAL ASSOCIATION OF MANUFACTURERS; NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS; SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Amici Supporting Respondent.

—————

On Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board. (5-CA-81306)

—————

Argued: March 22, 2013        Decided: July 17, 2013

—————

Before DUNCAN and DIAZ, Circuit Judges, and HAMILTON, Senior Circuit Judge.

_____

Enforcement denied by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Duncan joined. Judge Duncan wrote a separate concurring opinion. Judge Diaz wrote an opinion concurring in part and dissenting in part.

_____

**ARGUED:** Beth S. Brinkmann, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., David A. Seid, Robert James Englehart, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board; James B. Coppess, AFL-CIO, Washington, D.C., for International Association of Machinists and Aerospace Workers. Daniel R. Begian, John P. Hasman, THE LOWENBAUM PARTNERSHIP, LLC, Clayton, Missouri, for Enterprise Leasing Company Southeast, LLC; Gregory Branch Robertson, Michael Randolph Shebelskie, HUNTON & WILLIAMS, LLP, Richmond, Virginia, for Huntington Ingalls Incorporated. **ON BRIEF:** Stuart F. Delery, Principal Deputy Assistant Attorney General, Scott R. McIntosh, Sarang V. Damle, Melissa N. Patterson, Benjamin M. Shultz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Lafe E. Solomon, Acting General Counsel, Celeste J. Mattina, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Ruth E. Burdick, Supervisory Attorney, Daniel A. Blitz, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board. D. Michael Linihan, THE LOWENBAUM PARTNERSHIP, LLC, Clayton, Missouri, for Enterprise Leasing Company Southeast, LLC. Kurt G. Larkin, HUNTON & WILLIAMS, LLP, Richmond, Virginia, Dean C. Berry, HUNTINGTON INGALLS INDUSTRIES, INC., Newport News, Virginia, for Huntington Ingalls Incorporated. William H. Haller, Associate General Counsel, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Upper Marlboro, Maryland, for International Association of Machinists and Aerospace Workers. Mark Theodore, PROSKAUER ROSE LLP, Los Angeles, California, Ronald E. Meisburg, Lawrence Z. Lorber, James F. Segroves, PROSKAUER ROSE LLP, Washington, D.C., for Amici Curiae; Robin S. Conrad, Shane B. Kawka, NATIONAL CHAMBER LITIGATION CENTER, INC., Washington, D.C., for Amicus Curiae Chamber of Commerce of the United States; Quentin Riegel, NATIONAL ASSOCIATION OF MANUFACTURERS, Washington, D.C., for Amicus Curiae National Association of Manufacturers.

_____

HAMILTON, Senior Circuit Judge:

Before the court are two cases that we have consolidated. In the first case, Enterprise Leasing Company – Southeast, LLC (Enterprise) seeks review of a National Labor Relations Board (the Board) decision and order finding that Enterprise violated §§ 8(a)(1) and (a)(5) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1) and (5), by refusing to bargain with Local 391 of the International Brotherhood of Teamsters (Local 391) after the Board certified Local 391 as the exclusive bargaining representative of a unit of Enterprise's employees. The Board has filed an application for enforcement of its order.

In the second case, Huntington Ingalls, Inc. (Huntington) petitions for review of a Board decision and order finding that Huntington violated §§ 8(a)(1) and (a)(5) of the NLRA, id., by refusing to bargain with the International Association of Machinists and Aerospace Workers (Machinists Union) after the Board certified the Machinists Union as the exclusive bargaining representative of a unit of Huntington's employees. The Board has filed an application for enforcement of its order.

The determinative question in these cases is whether the Board had a quorum at the time it issued its decisions in 2012. See New Process Steel, L.P. v. NLRB, 130 S. Ct. 2635, 2639-45 (2010) (holding that, following a delegation of the NLRB's powers to a three-member group, two members cannot continue to

exercise that delegated authority once the group's (and the Board's) membership falls to two). Resolution of this question turns on whether the three appointments by the President of the United States to the Board on January 4, 2012 are valid under the Recess Appointments Clause of the United States Constitution, which provides that the President "shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl.3. If these appointments are invalid, the parties agree that the Board could not lawfully act when it issued its decisions in 2012. For the reasons stated below, we conclude that the President's three January 4, 2012 appointments to the Board are constitutionally infirm, because the appointments were not made during "the Recess of the Senate." Accordingly, we deny the Board's applications for enforcement of its orders.

I

The two cases currently before the court have a similar procedural history. Local 391 prevailed in an election conducted by the Board. Before a Board Hearing Officer in a representation case, Enterprise challenged the election result on multiple fronts. Enterprise lost the representation case before a Board Hearing Officer and lost again on review by the

Board. Following these losses, Enterprise refused to bargain with Local 391. Local 391 initiated an unfair labor practice proceeding against Enterprise, and, in response, Enterprise contended, among other things, that the Board lacked a quorum to issue a decision because the President's three January 4, 2012 appointments to the Board were invalid under the United States Constitution. The Board rejected Enterprise's arguments and ordered Enterprise to bargain with Local 391. The Board now seeks enforcement of its decision and order.

The dispute in Huntington's case centers on the appropriate bargaining unit for Huntington's 2,400 technical employees. Before a Board Regional Director (RD), the Machinists Union contended that a portion of Huntington's 2,400 technical employees, namely those in the "E85 RADCON" department, was an appropriate bargaining unit whereas Huntington contended that the bargaining unit should consist of all 2,400 of its technical employees. The RD agreed with the Machinists Union and issued a decision and direction of election (DDE). Huntington then requested Board review of the DDE. On December 30, 2011, the Board affirmed the RD's decision.

In the ensuing election, the Machinists Union prevailed. The Board subsequently certified the Machinists Union as the exclusive representative for purposes of collective bargaining. Following certification, Huntington refused to comply with the

- 6 -

Machinists Union bargaining request, and the Machinists Union filed an unfair labor practice charge. In that proceeding, Huntington contended, inter alia, that the Board did not have a quorum to issue a decision, because the President's three January 4, 2012 appointments to the Board were constitutionally infirm. The Board rejected this argument and others, holding that Huntington's refusal to bargain was unlawful. The Board seeks enforcement of this decision and order, and Huntington petitions for review of such decision.

In their respective briefs, both Enterprise and Huntington raise constitutional and non-constitutional arguments. Before we can address the constitutional arguments, we must first attempt to resolve these cases on non-constitutional grounds, if possible. See Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (noting that a court "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of"); see also Noel Canning v. NLRB, 705 F.3d 490, 493 (D.C. Cir.) (pursuant to Spector Motor and

Ashwander, court addressed non-constitutional claims concerning company's refusal to bargain before addressing the question of whether the President's three January 4, 2012 appointments to the Board were constitutional), cert. granted, 2013 WL 1774240 (U.S. June 24, 2013). In addressing the non-constitutional arguments advanced by both Enterprise and Huntington, we first will turn to Enterprise's case and then to Huntington's case.

II

A

Enterprise operates an Alamo and National car rental facility at the Raleigh-Durham International Airport (RDU Airport). On November 9, 2010, Local 391 filed a petition with the Board seeking to represent a unit of Enterprise's employees.[1] Enterprise and Local 391 signed an election agreement, and the Board conducted an election by secret ballot at Enterprise's facility from 7:00 p.m. to 9:00 p.m. on Thursday, December 16,

---

[1] The parties agree that the 101 employee bargaining unit consisted of full and regular part-time greeters, exit booth agents, counter representatives, rental agents, handler agents, service agents, customer service representatives, bus drivers, push/pullers, and mechanics employed by Enterprise. The bargaining unit excluded salaried employees, technical employees, office clerical employees, guards, professional employees, and supervisors.

2010, and from 10:00 a.m. to 12:00 p.m., and again from 3:00 p.m. to 5:00 p.m., on Friday, December 17, 2010.

At some point before the election, Local 391 mailed a flyer to all eligible voters which included a photograph of employee and eligible voter Roberto Henriquez without his prior authorization for Local 391 to use his photograph.[2] One side of the flyer contained the words, "Yes. Everybody can make the right choice!! To end Unfair treatment & Unfair pay!!" The words were surrounded by the photographs of eight employees of Enterprise, including Henriquez. The other side of the flyer had a note that asked employees to let Local 391 be their voice for better pay, benefits, and treatment. The photograph of Henriquez was taken by Chafik Omerani, an Enterprise employee and Local 391 supporter, at a food court in a shopping mall near the RDU Airport.

On the first day of the election, December 16, 2010, Wake County, North Carolina, where the RDU airport is located, experienced inclement weather. Weather records establish that between 1/10 and 1/8 of an inch of freezing rain and 1/2 to one inch of snow fell in Wake County on December 16. No additional

_____

[2] Henriquez did not testify at the hearing before the Board Hearing Officer. Accordingly, the record does not reflect whether Henriquez was or was not a Local 391 supporter. However, it is clear that his prior authorization was not obtained and that Local 391 had a general policy of not using employees' images without their prior consent.

- 9 -

freezing rain or snow fell on December 17, and there was no snow accumulation at the RDU airport or Enterprise's facility on either day.

As a result of the inclement weather, area schools and some businesses were closed on December 16. The opening of schools and some government businesses was delayed on December 17. The RDU Airport and Enterprise's facility at the airport remained open during regular hours on both December 16 and 17. Although Enterprise's facility remained open, it received ten employee "call-outs" on December 16 and four "call-outs" on December 17.[3] No evidence was presented concerning Enterprise's normal or average call-out rate. There was also no evidence presented indicating that any eligible Enterprise employee was unable to vote on account of the weather. Moreover, neither party sought to postpone the election on account of the weather.

On December 16, 2010, Local 391 organizer Steve Jones entered Enterprise's facility approximately thirty minutes before the start of the election. He approached the customer service counter where two Enterprise Customer Service Representatives, one of whom was Damion Knowles, were seated. After greeting Knowles, Jones asked him how his interview had

---

[3] "Call-out" is a term used to describe an employee who contacts his or her employer to report that he or she will not be coming to work.

gone for a management position that Knowles had mentioned in an earlier conversation between the two. Knowles replied that the interview went well and that with more experience he would receive his own store in Dallas, Texas. Jones noted that the International Brotherhood of Teamsters had members in the Dallas area and asked Knowles if he still had Jones' business card. After Knowles answered affirmatively, Jones stated, "[w]ell, keep it, you know, you never know, you might need me sometime. You never want to burn any bridges."

Eighty-seven votes were cast in the election. Forty-four employees voted for Local 391; forty-one against. There were two challenged ballots, an insufficient number to affect the outcome of the election.

On December 27, 2010, Enterprise filed six objections to the election with the RD. A hearing was ordered before a Board Hearing Officer. On February 7, 2011, the Board Hearing Officer issued his Report and Recommendation recommending that Enterprise's objections be overruled and that a Certification of Representative issue.

Enterprise then filed exceptions with the Board to the Board Hearing Officer's Report and Recommendation. On December 29, 2011, the Board adopted the Board Hearing Officer's recommendations to overrule Enterprise's objections, and the

Board certified Local 391 as collective bargaining representative of the Enterprise unit employees.

On January 17, 2012, Local 391 asked Enterprise to bargain with it, and Enterprise refused. On February 3, 2012, Local 391 filed an unfair labor practices charge with the Board alleging that Enterprise violated the NLRA by refusing to bargain with it. On February 27, 2012 the Board's General Counsel issued a complaint against Enterprise. On March 14, 2012, the Board's General Counsel filed a motion for summary judgment.

On April 18, 2012, the Board granted the Board's General Counsel's motion for summary judgment, holding that Enterprise violated §§ 8(a)(1) and (a)(5) of the NLRA by refusing to bargain with Local 391. The Board's order requires Enterprise to cease and desist from engaging in the unfair labor practices found and from in any like or related manner interfering with, restraining, or coercing employees in the exercise of their rights under the NLRA. Affirmatively, the Board's order requires Enterprise to bargain with Local 391 upon request and embody any understanding reached in a signed agreement. The order also requires Enterprise to post a remedial notice and, if appropriate, distribute copies of the notice electronically.

B

Section 8(a)(1) of the NLRA makes it an unfair labor practice to "interfere with, restrain, or coerce employees in

the exercise of [their rights under the NLRA]," while § 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. §§ 158(a)(1), (5). Enterprise admits that it refused to bargain with Local 391, but claims that the Board erred in refusing to set aside the results of the election.

A union may obtain certification in one of two ways: through an election or the employer's voluntary recognition. Lincoln Park Zoological Soc. v. NLRB, 116 F.3d 216, 219 (7th Cir. 1997). Here, of course, there was no voluntary recognition. Thus, we must address whether Local 391 obtained recognition through a valid election.

"Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946). Consequently, we presume the validity of a Board-supervised election and will overturn such an election only if the Board has clearly abused its discretion. NLRB v. Media Gen. Operations, Inc., 360 F.3d 434, 441 (4th Cir. 2004); NLRB v. Flambeau Airmold Corp., 178 F.3d 705, 707 (4th Cir. 1999).

A party seeking to have an election set aside bears a heavy burden and must prove by specific evidence not only that

improprieties occurred, but also that they prevented a fair election. Elizabethtown Gas Co. v. NLRB, 212 F.3d 257, 262 (4th Cir. 2000). When evaluating whether a party has met this heavy burden, we must be "mindful of the real world environment in which an election takes place." NLRB v. Coca-Cola Bottling Co., 132 F.3d 1001, 1003 (4th Cir. 1997). "Although the Board strives to maintain laboratory conditions in elections, clinical asepsis is an unattainable goal. An election is by its nature a rough and tumble affair, and a certain amount of exaggerations, hyperbole, and appeals to emotion are to be expected." Id. (citation and internal quotation marks omitted).

The Board's "findings of fact are conclusive as long as they are 'supported by substantial evidence on the record considered as a whole.'" Evergreen Am. Corp. v. NLRB, 531 F.3d 321, 326 (4th Cir. 2008) (quoting 29 U.S.C. § 160(e)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "While the Board may not base its inference on pure speculation[,] it may draw reasonable inferences from the evidence." Overnite Transp. Co. v. NLRB, 280 F.3d 417, 428 (4th Cir. 2002) (en banc) (alteration, ellipsis, and internal quotation marks omitted).

1

Enterprise first contends that the results of the election must be set aside because Local 391 used a photograph of Enterprise employee Roberto Henriquez on a campaign flyer without Henriquez's prior authorization. In rejecting this contention, the Board found that, at most, Local 391 "implicitly misrepresented that Henriquez authorized the use of his image in the flyer." Enterprise Leasing Co. — Southeast, LLC, 2011 WL 6853530, at *2 (NLRB 2011). According to the Board, such misrepresentation did not warrant setting aside the results of the election, because there was no evidence that Local 391 in fact misrepresented Henriquez's support for Local 391 or that he objected to Local 391's use of his photograph on the flyer. The Board also emphasized that there was no evidence of pervasive misrepresentations regarding Enterprise employee authorization for use of photographs or any claim that eligible Enterprise employees were unable to recognize the flyer as anything else than Local 391 propaganda.

In Midland National Life Insurance Company, 263 NLRB 127 (1982), which was approved by this court in Case Farms of North Carolina, Incorporated v. NLRB, 128 F.3d 841 (4th Cir. 1997), the Board outlined the standard regarding misrepresentations occurring in the context of campaign statements. Midland, 263 NLRB at 129-33. Under the Midland standard, the Board "no longer probe[s] into the truth or falsity of the parties'

campaign statements" nor will it "set elections aside on the basis of misleading campaign statements." Id. at 133; see also Case Farms, 128 F.3d at 844 (quoting Midland).

The only exception to the Midland standard concerns forged documents. Midland, 263 NLRB at 133. The premise behind this particular exception evidences the Board's central concern that employee voters not be deceived with respect to the true nature of the statement in campaign propaganda. Id. In outlining the Midland standard, the Board displayed its faith in the employee voters' ability not to accept what they are told at face value, but, instead, to weigh it according to its potential for bias. Accordingly, the Board determined that it would "set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is." Id. The Board further distinguished misrepresentations, which would not require the election to be set aside, from other types of campaign misconduct, "such as threats, promises, or the like," which if adequately proven would warrant setting aside the results of an election. Id.

In this case, we cannot say that the Board misapplied "the permissive Midland standard." Case Farms, 128 F.3d at 845. Even if, as Enterprise suggests, the evidence proved that Henriquez did not authorize the use of his image, such evidence

- 16 -

would still amount to a mere misrepresentation in the campaign context. Local 391's conduct involved no forgery, and there is nothing in the record to indicate that the eligible Enterprise employees' ability to recognize the flyer as campaign propaganda was compromised. Moreover, the Board's rejection of Enterprise's campaign flyer claim is consistent with its prior precedent. See Somerset Valley Rehab. & Nursing Center, 2011 WL 4498270, at **1-3 (NLRB 2011) (overruling objection where a union falsely quoted union supporters as actually stating that they would vote for the union); BFI Waste Servs., 343 NLRB 254, 254 n.2 (2004) (overruling objection where a union arguably misrepresented quotes from two employees); Champaign Residential Servs. Inc., 325 NLRB 687, 687 (1998) (overruling objection where two employees did not know that their signatures in support of a union would be shared with others on a flyer); Findlay Indus. Inc., 323 NLRB 766, 766 n.2 (1997) (overruling objection where a union, at most, misrepresented that two employees would vote for it).

In support of its position, Enterprise asserts that the Board has established a per se rule preventing unions and employers from using the photograph of an employee without the employee's prior authorization, citing Brentwood At Hobart v. NLRB, 675 F.3d 999 (6th Cir. 2012), Sprain Brook Manor Nursing Home, LLC, 348 NLRB 851 (2006), Allegheny Ludlum Corporation,

- 17 -

333 NLRB 734 (2001), and Sony Corporation of America, 313 NLRB 420 (1993). However, the Board's precedent has not established such a per se rule.

In Brentwood At Hobart, the court merely recited an unremarkable proposition that unauthorized photos "may taint" an election, but found that the employer waived its claim by failing to present it to the Board. 675 F.3d at 1001, 1005-07. Thus, the court did not recognize a per se rule. In Sprain Brook, the Board declined to overturn an election because the union had purportedly photographed employees without their consent and then used the photographs in its campaign materials. 348 NLRB at 851. The Board noted that the union had obtained signed consent forms from employees prior to using their photographs, id., but it did not hold that the use of employee photographs without such consent is per se objectionable.

In Allegheny Ludlum, the Board set forth five prerequisites for permissible employer videotaping of employees for a campaign video which included assurances that an employee's participation was voluntary, 333 NLRB at 743; it also explicitly stated that it was not creating a per se rule that "employers must obtain employees' explicit consent before including their images in campaign videotapes." Id. at 744. Further, to the extent that its earlier decision in Sony was being construed as establishing a per se rule requiring explicit employee consent, the Board in

*Allegheny Ludlum* said that such a construction was "unintended and unwarranted."  *Id.*

In sum, we hold that the Board's determination that the results of the election should not be set aside because Local 391 used a photograph of Enterprise employee Roberto Henriquez on a campaign flyer without Henriquez's prior authorization is supported by substantial evidence.

2

Enterprise also contends that the election results should be set aside because an ice/snow storm on December 16, 2010 in the Wake County, North Carolina area caused a determinative number of eligible Enterprise employees not to vote in the election held on December 16 and 17.  Adopting the reasoning of the Board Hearing Officer, the Board concluded that Enterprise failed to show that the severity of the weather conditions reasonably denied eligible Enterprise employees an adequate opportunity to vote.

In *In re Baker Victory Services, Inc.*, 331 NLRB 1068 (2000), the Board stated that an election "should be set aside where severe weather conditions on the day of the election reasonably denied eligible voters an adequate opportunity to vote and a determinative number did not vote."  *Id.* at 1070; *see also* *V.I.P. Limousine, Inc.*, 274 NLRB 641, 641 (1985) (noting that an election should be set aside where the inclement weather

"affect[s] the electorate as a whole" and "[a] substantial number of employees did not vote in the election"). Applying this standard, we find no reason to disturb the Board's decision.

Neither the RDU Airport nor Enterprise's car rental facility closed at any time on December 16 or 17, 2010 because of the inclement weather. Moreover, there is no evidence that the weather conditions affected the ability of any eligible Enterprise employee to vote, especially when the weather improved on December 17, a day where eligible Enterprise employees were offered two different time periods in which to vote.

Enterprise turns our attention to the testimony of Jill Trout, Enterprise's Human Resources Manager, that Enterprise received about ten "call outs" on December 16, 2010 and four more on December 17. However, Enterprise presented no evidence regarding its normal call-out rate, and, thus, the meaning of this evidence cannot be discerned. Moreover, Trout testified that she had no personal knowledge of the reason for the call-outs, nor did she have any knowledge of any eligible Enterprise employee who did not vote on account of the weather. Under such circumstances, Trout's testimony sheds no light on whether eligible Enterprise employees were denied an opportunity to vote.

- 20 -

The Board's ruling on Enterprise's contention concerning the inclement weather is consistent with its reasoned decisions. For example, in V.I.P. Limousine, the Board understandably set aside an election where twenty inches of snow fell around the election site in Connecticut during the polling period, "making navigation of the roads extremely difficult, if not impossible." 274 NLRB at 641. Similarly, in Baker Victory, the Board properly set aside an election where more than four feet of snow had fallen in the City of Buffalo during the two-week period preceding the election, and a state of emergency had been declared for the city during the week of the election. 331 NLRB at 1069.

Unlike the weather conditions in V.I.P. Limousine and Baker Victory, there is no evidence that weather conditions impacted the ability of the eligible Enterprise employees to vote. As noted above, Enterprise's car rental facility remained open throughout the inclement weather on December 16, 2010, and there is no evidence that weather was a serious issue when the polls were open on December 17. Accordingly, the Board's determination that the results of the election should not be set aside because of the ice/snow storm on December 16 in the Wake County, North Carolina area is supported by substantial evidence.

3

Enterprise contends that the results of the election should be set aside because union organizer Steve Jones told Enterprise employee Damion Knowles in the presence of other Enterprise employees that "[y]ou never want to burn any bridges." In support of this contention, Enterprise heavily relies on the subjective reaction of Knowles, who says he felt physically threatened by Jones's statement. However, adopting the reasoning of the Board Hearing Officer, the Board concluded that Jones's statement failed to establish that the free choice of a reasonable employee would have been hindered. We agree with the Board.

First off, we have recognized that the "'[s]ubjective reactions of employees are irrelevant to the question of whether there was, in fact, objectionable conduct." Media Gen. Operations, 360 F.3d at 442 (quoting Kmart Corp., 322 NLRB 1014, 1015 (1997)). This is so because the test for coercion is an objective one. Id.

Second, embracing Enterprise's argument would do harm to the precedent that recognizes that "election campaigns, by their nature, are rough and tumble affairs, and they typically involve elements of pressure or inducement." Id. A certain amount of hyperbole and exaggeration is expected in an election campaign, which is why the responsibility for assessing the relevant facts and deciding whether the union's conduct interfered with a

reasonable employee's free and fair choice in a representation election lies with the Board.  Id.  This case is no different.

Third and finally, we agree with the Board that, even if Knowles' statement could somehow be construed as a threat, the statement merely implied that Knowles should not forsake a good relationship with Jones, even if Knowles moved into management, because no one knows what the future may bring.  As such, the statement would not coerce a voter or cause a voter to change his or her vote.  Cf. id. (holding that a union agent did not engage in coercive conduct when he told employees that they should sign a petition stating they would vote for the union to "'separate the men from the boys'").

In sum, the Board's determination that the results of the election should not be set aside because Jones told Knowles that "[y]ou never want to burn any bridges" is supported by substantial evidence.


III

A

Huntington, formerly Northrop Grumman Shipbuilding, operates a shipbuilding and dry dock facility in Newport News, Virginia.  Its principal business is the construction, repair, and overhaul of United States Navy vessels, particularly nuclear-powered aircraft carriers and submarines.

The construction of an aircraft carrier is a complicated task. Its construction requires a carefully planned and highly integrated design and manufacturing process involving thousands of employees. The lifespan of an aircraft carrier construction project, from the time the keel is laid through completion, takes between five and six years. Submarines are smaller than aircraft carriers but similarly challenging to design and construct. The process used to build submarines is not unlike that used for aircraft carriers.

Huntington also performs considerable refueling and overhaul work. Nuclear-powered aircraft carriers require refueling of their nuclear core after about twenty-five years of operation. This intricate process requires over three years to complete. During refueling, Huntington also performs a general overhaul of the ship, updating computer, electronic, and combat systems. As with initial construction, refueling and overhaul involves the integrated work of thousands of employees.

Huntington employs approximately 18,500 people. It divides its workforce into four categories—professional, administrative, production and maintenance, and technical. This case concerns Huntington's approximately 2,400 technical

employees.[4]   Technical employees perform non-manual work requiring some sort of specialized training.  Huntington groups technical employees into ten job classifications: (1) quality inspectors; (2) test technicians; (3) designers; (4) engineering technicians; (5) dimensional control technicians; (6) laboratory technicians; (7) chemical handlers; (8) planners; (9) radiological control technicians (RCTs); and (10) calibration technicians.

The technical employees in almost all of these job classifications work in various divisions and departments, and work at various locations throughout the shipyard.[5]  The RCTs and

---

[4] In addition to the technical employees, Huntington employs approximately 2,000 professional employees (mostly engineers), approximately 1,500 administrative employees (mostly office and clerical staff), approximately 8,500 production and maintenance employees (electricians, welders, machinists, janitors, and riggers, among others), approximately 2,500 supervisory employees (foremen, managers, superintendents, supervisors, directors, and vice presidents), and approximately 1,600 other employees who perform various tasks.  The production and maintenance employees, the guards, and the firefighters are the only employees represented by a union.

[5] Structurally, Huntington is headed by a General Manager, who oversees six operating divisions.  The six operating divisions are: (1) Navy Programs Division, which provides overall management and oversight over aircraft carrier and submarine construction and aircraft carrier overhaul; (2) the Operations and Manufacturing Division, which handles the manufacture of ship components in the first phase of production for assembly on the ships; (3) the Quality and Process Excellence Division, which audits and inspects production work and provides record reviews and ensures that contract specifications are met; (4) the Waterfront Nuclear Engineering (Continued)

calibration technicians are only assigned to one department within Huntington's Nuclear Services Division called "E85 RADCON." Technical employees are salaried, have their own labor and salary grades separate from all other employees and are paid under the same bi-weekly payroll system. They are covered by the same personnel policies and are eligible for the same pension, 401(k), medical, dental, insurance, and sick leave plans and other benefits programs, as are all unrepresented salaried employees. They all perform non-manual work of a technical nature, requiring the exercise of specialized training, some on-the-job and others requiring additional extensive coursework. Seven of the ten technical classifications have some limited radiation worker training. Aside from the RCTs, who have extensive radiological control training, designers, test technicians, quality inspectors, laboratory technicians, calibration technicians, and chemical handlers all are given dosimetry training of two to five days because their duties require that they enter radiological controlled areas. Many employees do not enter such areas.

---

and Test Services Division (Nuclear Services Division), which provides oversight of the nuclear aspects of Huntington's operations; (5) the Commercial Nuclear Programs Department, which is involved in the construction of commercial nuclear plant equipment and systems; and (6) the Department of Energy Programs Office, which is involved with various programs offered by the Department of Energy.

Quality inspectors provide oversight for the construction, maintenance and overhaul, and refueling of the nuclear vessels. They use drawings prepared by other technicians to ensure that all construction and repair work is performed within the specifications of the drawing requirements.

Test technicians perform a variety of nuclear and non-nuclear mechanical and electrical testing on a ship's component systems. The non-nuclear test technicians work on propulsion and combat systems while the nuclear test technicians work on various nuclear systems. Both nuclear and non-nuclear test technicians help establish system conditions and execute work control documents during the shipbuilding process.

Designers create drawings and blueprints that serve as guides for the manufacturing of ship components and ship assembly. They frequently visit the ships to analyze various components and systems on which they are working.

Engineering technicians typically are former Navy personnel with aptitude in mechanical and electrical systems. They interface with engineers, designers, and the construction workers who build ship systems. They also prepare technical work documents that guide certain work processes.

Dimension control technicians provide metrology services. They use precision instruments to measure the dimensions of large ship structures and machinery foundations so that

components can be constructed to fit together properly. They map these materials with photogrammetric instruments and laser trackers, which requires extensive training.

Laboratory technicians test production materials and elements generated by shipbuilding. They perform environmental sampling, metals and coating analysis, water chemistry analysis, and mechanical and metallurgy testing. They also examine and test materials generated during nuclear work.

Chemical Handlers dispose of hazardous materials generated during shipbuilding and overhaul. They primarily handle the radioactive waste generated during nuclear work.

Planners review ship designs, technical work documents, and other drawings to determine the proper sequencing of work and material procurement. They determine needed materials and when they need to be delivered.

RCTs are part of a department within Huntington's Nuclear Services Division called "E85 RADCON." There are approximately 140 RCTs in the E85 RADCON department. There are also other technical employees in the department, namely, twenty laboratory technicians, three calibration technicians, and sixty RCT trainees.

RCTs essentially perform a safety function: providing independent radiological oversight for nuclear work areas. RCTs track radiation levels and ensure that individual employees'

exposure remains within safe limits. They are also responsible for ensuring that employees meet the radiological control standards required for Huntington to maintain its license to work with nuclear materials. Huntington's overall radiological control philosophy is known as "ALARA" (As Low As Reasonably Achievable), and RCT independence is the key to that approach. Under ALARA, although all nuclear workers are expected to minimize both their personal exposure and wider contamination, RCTs are responsible for maintaining protocols and achieving the required containment. Therefore, under the ALARA program, RCTs are in a separate department from the rest of the work force in order to facilitate oversight that is independent of both production and quality control.

RCT oversight has two prongs: maintaining radiological control areas and performing routine radiological surveys. RCTs set up control areas to restrict access near nuclear reactors, work sites, components, and materials, both on ships and in the shops. They use Technical Work Documents (TWDs) and drawings to make a map of areas that require controls and then survey to establish the baseline radiation levels and find "hot spots," which are then marked on the maps. In monitored controlled areas, RCTs set up barriers, signs, and employee checkpoints. In less restricted control areas, RCTs simply leave an area roped off with signs designating the requirements for entry.

At monitored control areas with established checkpoints, RCTs observe and restrict employee traffic. Only employees with radiological safety training can enter, and RCTs question them about their jobs and the materials and tools they are taking in with them. Then, RCTs assign each employee a dosimeter to record the employee's dose of radiation, and brief employees about the hot spots before allowing entry. As employees leave, RCTs collect the dosimeters, note employees' exposure, confirm that they followed control protocols and screen materials that they bring out of the area. When they observe contamination or irregularity, they order that work be stopped and submit a radiological deficiency report.

RCTs conduct routine radiological surveys around the shipyard on rotations ranging from daily to annually, in addition to performing surveys that are required during particular tests and projects. For "contamination surveys," RCTs wipe surfaces to test for contaminants and in "radiation surveys," they use a probe to take contact or ambient radiation readings. Surveys can take anywhere from fifteen minutes to two hours, depending on the type of survey required.

Laboratory technicians within the E85 RADCON department test the materials collected by the RCTs, help calibrate dosimetry equipment, and screen potentially contaminated materials that require laboratory tests. E85 RADCON

calibration technicians maintain and calibrate the instruments used by RCTs. As a result, they are qualified to operate all of the instruments that RCTs use. They interact with RCTs when they pick up and replace faulty equipment.

RCT trainees perform some of the routine surveys and monitor limited control points during their on-the-job training. They can set up the area and allow certain workers inside.

Occasionally, other technical employees perform work similar to the surveys performed by RCTs. Environmental laboratory technicians perform radiation and contamination surveys of drainage ditches and outfalls to make sure that various contaminants do not spread to the environment, but it is unclear from the record how often they do this. Nuclear chemical handlers are qualified to do radiation and contamination surveys on their vehicles, although, again, the record does not show how often they actually do so. There are no temporary transfers into or out of E85 RADCON classifications. However, there have been permanent transfers. There is evidence that RCTs have transferred into other technical classifications, but no evidence about how many or how often this occurs.

RCTs receive highly specialized training. They attend orientation at the shipyard for their first month and then leave for a twenty-two week training course run by the United States

Navy. This training requires math and physical sciences aptitude and only half of the RCT trainees graduate. After graduation, Huntington conducts five weeks of training at its facility and then administers a full-day oral examination. RCTs must take requalification training every thirty months and attend "spill drills" to practice responding to emergencies on a quarterly basis. Other technical employees receive, at most, only a few days of radiological safety training. Like most other employees, RCTs are required to possess government security clearance of "confidential" or higher.

RCTs use specialized tools, including approximately twenty-seven radiation detection instruments. They receive orange kit bags and additional supplies such as "wipes, laws, tweezers, [and] bags." Only RCTs receive the orange bags. A few other technical classifications are qualified to use some of these tools, including environmental laboratory technicians and nuclear chemical handlers who perform occasional surveys.

RCTs have daily, work-related contact with all employees who enter radiological control areas. Most of these are trades employees (painters, machinists, pipefitters, etc.), supervisors, and other non-technical employees. At certain stages during refueling overhauls and during the final months of new ship construction, RCTs have increased contact at control points with other technical employees, mostly quality inspectors

and test technicians, but also designers and engineering technicians. Contact with employees at the control points is brief and involves monitoring them as described above, not working together to perform technical or production-oriented jobs. During new construction, there is a period of five or more years before RCTs are present on the ships. Even during refueling overhauls, which require radiological oversight from the beginning, RCTs' contact with other technicians varies substantially throughout the period of the ship's availability depending on the phase of production and whether RCTs are assigned to the ship or the shops.

B

On March 3, 2009, the Machinists Union petitioned the Board to represent the RCTs in the E85 RADCON department. In the alternative, the Machinists Union agreed to proceed to an election in a departmental unit of all of the technical employees in the E85 RADCON department. Huntington argued that the smallest appropriate unit had to include all of its 2,400 technical employees.

Following a hearing, the RD issued a DDE on May 29, 2009, finding that a unit consisting of the technical employees in the E85 RADCON department (namely, the RCTs, calibration technicians, laboratory technicians, and RCT trainees) was appropriate for purposes of collective bargaining. Huntington

- 33 -

requested Board review of the DDE, contending that an appropriate unit must include all of its 2,400 technical employees. On December 30, 2011, the Board affirmed the RD's decision.

In the ensuing Board-conducted election, the technical employees of the E85 RADCON department voted for representation by the Machinists Union. The Board subsequently certified the Machinists Union as the exclusive representative for purposes of collective bargaining.

Following certification, Huntington refused to comply with the Machinists Union bargaining request in order to contest the validity of the certification. The Machinists Union filed an unfair labor practices charge, and the Board's General Counsel issued a complaint alleging that Huntington's refusal was unlawful. The General Counsel subsequently filed a motion for summary judgment, which Huntington opposed. Huntington claimed once again that the bargaining unit must include all 2,400 of Huntington's technical employees. Alternatively, Huntington argued that the Board lacked a quorum to issue its decision and order.

On August 14, 2012, the Board issued a decision and order granting the motion for summary judgment, finding that Huntington's refusal to bargain was unlawful. The Board's decision and order requires Huntington to cease and desist from

its unlawful conduct and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights under the NLRA. Affirmatively, the Board's decision and order requires Huntington to bargain with the Machinists Union upon request and embody any understanding reached in a signed agreement. The decision and order also requires Huntington to post a remedial notice and, if appropriate, distribute copies of the notice electronically.

C

Section 9(a) of the NLRA provides that a union will be the exclusive bargaining representative if chosen "by the majority of the employees in a unit appropriate for" collective bargaining. 29 U.S.C. § 159(a). Section 9(b) authorizes the Board to "decide in each case whether, in order to assure the employees the fullest freedom in exercising the rights guaranteed by [the NLRA], the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." Id. § 159(b). The Supreme Court, in construing § 9(b), has stated that the determination of an appropriate unit "lies largely within the discretion of the Board, whose decision, if not final is rarely to be disturbed." South Prairie Constr. Co. v. Operating Eng'rs, Local 627, 425 U.S. 800, 805 (1976) (citation and internal quotation marks omitted). Further, the Board is possessed of

- 35 -

the widest possible discretion in determining the appropriate unit. Sandvik Rock Tools, Inc. v. NLRB, 194 F.3d 531, 534 (4th Cir. 1999).

Section 9(b), however, does not direct the Board how it is to decide in a given case whether a particular grouping of employees is appropriate. Accordingly, the Board's selection of an appropriate unit "involves of necessity a large measure of informed discretion." Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491 (1947).

Nothing in the NLRA requires that the unit for bargaining be the only appropriate unit, or the ultimate unit, or the most appropriate unit; the NLRA only requires that the unit be "appropriate." Sandvik Rock, 194 F.3d at 534; see also Overnite Transp. Co., 322 NLRB 723, 723 (1996) ("The Board, however, does not compel a petitioner to seek any particular appropriate unit. The Board's declared policy is to consider only whether the unit requested is an appropriate one, even though it may not be the optimum or most appropriate unit for collective bargaining."). As the Supreme Court has stated, "employees may seek to organize 'a unit' that is 'appropriate'--not necessarily the single most appropriate unit." Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 610 (1991).

The focus of the Board's determination begins with the bargaining unit sought by the petitioner, because, under § 9(d)

of the NLRA, "the initiative in selecting an appropriate unit resides with the employees." Id. Further, "[i]n many cases, there is no 'right unit' and the Board is faced with alternative appropriate units." Corrie Corp. of Charleston v. NLRB, 375 F.2d 149, 154 (4th Cir. 1967). It is within the Board's discretion to select among different potential groupings of employees in determining an appropriate unit. Fair Oaks Anesthesia Assocs., P.C. v. NLRB, 975 F.2d 1068, 1071 (4th Cir. 1992).

1

In this case, the RD applied the bargaining unit standard the Board has applied in cases involving technical employees.[6] Under this standard, a unit consisting of only a subset of an employer's technical employees is appropriate "when the employees in the requested unit possess a sufficiently distinct community of interest apart from other technicals to warrant their establishment as a separate appropriate unit." TRW Carr Div., 266 NLRB 326, 326 n.4 (1983). Under the TRW Carr standard, the burden is on the union seeking representation of the subset of technical employees to demonstrate the distinct

---

[6] Technical employees are those who do not meet the NLRA's definition of professional employee, 29 U.S.C. § 152(12), but whose work involves independent judgment and requires specialized training. NLRB v. Sweetwater Hosp. Ass'n, 604 F.2d 454, 456 n.2 (6th Cir. 1979).

community of interest.  Id. at 326 n.3 ("Showing that some technical employees perform their duties in another phase of the Employer's operation is not enough to establish affirmatively why the segmented group of technical employees should be represented separately."); see also Bendix Corp., 150 NLRB 718, 720 (1964) ("But it is not enough for the Petitioner to show that it is willing to represent all the electronic technicians at the plant; it must also establish affirmatively why they should be represented separately.").

The RD concluded that Huntington's RCTs possess a distinct community of interest from all other technicals outside of the E85 RADCON department.  The RD noted that the RCTs, inter alia, possess unique skills, undergo intensive, lengthy, and specialized training, have distinct job functions, utilize special tools and equipment, do not temporarily interchange with other technicals, and have separate supervision.  The RD further noted that the level of functional integration and contact with non-radiological control technicals was not so substantial as to negate their separate and distinct community of interest.

With regard to the RCT trainees, calibration technicians, and laboratory technicians in the E85 RADCON department, the RD concluded that these employees share a community of interest with the RCTs sufficient to require their inclusion in the bargaining unit.  The RD noted that the calibration technicians

and laboratory technicians are in the same department, have job duties functionally related and integrated in that all are responsible for radiological control at the facility, are trained to use the same specialized equipment, work out of the E85 RADCON facilities, and are under the same departmental supervision hierarchy. The RD also noted that most of the laboratory technicians in the E85 RADCON department have progressed from the RCT classification and that laboratory technicians generally do not interact with the laboratory technicians outside of the E85 RADCON department.

With regard to the calibration technicians in the E85 RADCON department, the RD noted that, while not required to possess the same training or perform the same duties as the RCTs, these employees work on and operate the instruments and equipment used by the RCTs and are responsible for ensuring that these instruments and equipment are in working order. With regard to the RCT trainees, the RD noted that it was undisputed that these employees received the same training as the RCTs in order for them to become monitors in the next step of their job progression.

Based on all of this evidence, the RD held that a departmental unit of technical employees (RCTs, laboratory technicians, calibration technicians, and RCT trainees) in the E85 RADCON department constituted a functionally distinct group

with a sufficiently distinct community of interest as to warrant a separate unit appropriate for the purposes of collective bargaining.

On review of the RD's decision, the Board analyzed the case under both the TRW Carr standard and the "community of interest" standard, which the Board clarified in Specialty Healthcare & Rehab. Ctr. of Mobile, 2011 WL 3916077 (NLRB 2011), a case decided after the RD's decision.[7] Following a line of Board authority, Specialty Healthcare made clear that the appropriate bargaining unit determination turns on whether the petitioned-for employees share a "community of interest." Specialty Healthcare, 2011 WL 3916077, at *14 (citation and internal quotation marks omitted).[8] An employer challenging the Board's

---

[7] The Board observed that, "arguably," it had developed a different standard for determining whether a unit of technical employees is appropriate. Northrop Grumman Shipbuilding, Inc., 2011 WL 7121890, at *6 (NLRB 2011). The Board further observed that it need not reach the question of "whether a distinct test exists for technical employees," because it would "reach the same result even under the technical employee line of cases." Id. The RD understandably did not cite to Specialty Healthcare because, as noted above, the case was decided after he issued his decision.

[8] The "community of interest" test requires the Board to examine twelve equally important criteria in determining whether the employees seeking to be represented by a union share a sufficient community of interest to form an appropriate bargaining unit. NLRB v. Lundy Packing Co., 68 F.3d 1577, 1580 (4th Cir. 1995). The twelve factors the Board must examine are the following:

(Continued)

unit determination under the community of interest standard has the burden to prove that the bargaining unit selected is "utterly inappropriate." Sandvik Rock, 194 F.3d at 534 (citation and internal quotation marks omitted); see also Blue Man Vegas, LLC v. NLRB, 529 F.3d 417, 421 (D.C. Cir. 2008) (noting that, if the objecting party shows that excluded employees "share an overwhelming community of interest" with the employees in the otherwise appropriate unit, then there is no legitimate basis to exclude them); Specialty Healthcare, 2011 WL 3916077, at *17 (noting that "the Board will find the petitioned-for unit to be an appropriate unit, despite a contention that employees in the unit could be placed in a larger unit which would also be appropriate or even more appropriate, unless the party so contending demonstrates that

---

(1) similarity in the scale and manner of determining the earnings; (2) similarity in employment benefits, hours of work, and other terms and conditions of employment; (3) similarity in the kind of work performed; (4) similarity in the qualifications, skills and training of the employees; (5) frequency of contact or interchange among the employees; (6) geographic proximity; (7) continuity or integration of production processes; (8) common supervision and determination of labor-relations policy; (9) relationship to the administrative organization of the employer; (10) history of collective bargaining; (11) desires of the affected employees; [and] (12) extent of union organization.

Id.

employees in the larger unit share an overwhelming community of interest with those in the petitioned-for unit"). In Specialty Healthcare, the Board noted that additional employees share an overwhelming community of interest with the petitioned-for employees only when there is no legitimate basis upon which to exclude the employees from the larger unit because the traditional community of interest factors "'overlap almost completely.'" 2011 WL 3916077, at *16 (quoting Blue Man Vegas, 529 F.3d at 422).[9]

In analyzing the case under both of these standards, the Board first turned to the Specialty Healthcare standard. Applying this standard, the Board concluded that the E85 RADCON technical employees shared a community of interest under the Board's community of interest criteria. The Board noted that the E85 RADCON technical employees all worked in the same department under common supervision and their work had a shared

---

[9] There is obvious tension between the TRW Carr standard and the community of interest standard clarified in Specialty Healthcare. The TRW Carr standard places the burden on the union, while the community of interest standard clarified in Specialty Healthcare places the burden on the employer. Moreover, the overwhelming community of interest component of the community of interest standard may run afoul of our decision in Lundy Packing. See 68 F.3d at 1581 ("By presuming the union-proposed unit proper unless there is an overwhelming community of interest with excluded employees, the Board effectively accorded controlling weight to the extent of union organization. This is because "the union will propose the unit it has organized.") (citation and internal quotation marks omitted). These are tensions, however, which we need not resolve here.

purpose and was functionally integrated. The Board further noted that the RCTs monitor employees and collect samples when appropriate; they rely on laboratory technicians to analyze the samples they collect; and calibration technicians keep the RCTs' instruments in proper working order. The Board noted that RCT trainees assist RCTs and operate limited control checkpoints as they learn the job, and that many of the E85 RADCON laboratory technicians used to be RCTs.

The Board rejected Huntington's argument that the technical employees outside of the E85 RADCON department shared an overwhelming community of interest with the E85 RADCON technical employees. The Board noted that all of the facts relied upon by Huntington (namely, that all of Huntington's technicians operate under the same salary structure and personnel policies, share break facilities, and enjoy the same benefits) were outweighed by the facts distinguishing the E85 RADCON technicians from the other technicians. In so noting, the Board emphasized that the RCTs' job function was to ensure workplace safety and control radioactive contamination at the shipyard, a task distinct from the production-oriented jobs of technical employees outside of the E85 RADCON department. Consequently, the Board concluded that the RCTs are not functionally integrated into the production work flow of the shipyard, but instead have an independent oversight role, and often their role conflicted with

the production and quality control goals of other technical employees.

The Board also emphasized that, in keeping with the RCTs' independent oversight role, Huntington had placed all the RCTs in a separate department, under separate supervision from its production employees. In addition, work contacts between the RCTs and other technical employees were brief and limited to the same radioactive screening at safety checkpoints that thousands of trades employees receive, with only a few exceptions during particular projects. The Board further emphasized that the RCTs receive extensive and highly-specialized radiological training and use numerous radiation detection instruments specific to their job; as a result, they possess unique skills. Based on this evidence, the Board concluded that the technical employees in the E85 RADCON department shared a community of interest sufficiently distinct from Huntington's production-oriented technical employees at the shipyard.

The Board then turned to the standard set forth in TRW Carr. The Board agreed with the RD's extensive reasoning, discussed above, supporting his conclusion that, under the TRW Carr standard, the technical employees in the E85 RADCON department shared a community of interest distinct from that which they share with the production-oriented technical employees in Huntington's shipyard. Accordingly, the Board

concluded that, under the TRW Carr standard, a unit of all of the technical employees in the E85 RADCON department was an appropriate unit for collective bargaining.

2

Huntington attacks the Specialty Healthcare standard on a variety of fronts. For example, Huntington argues that the Board's Specialty Healthcare standard, in particular the overwhelming community of interest portion of that standard, improperly gives controlling weight to a union's extent [of organization] in the workplace and, thus, offends § 9(c)(5) of the NLRA, which provides that the Board, in making unit determinations, shall ensure that "the extent of organization shall not be controlling." 29 U.S.C. § 159(c)(5). Huntington also argues that the Specialty Healthcare standard usurps the well-settled standard for technical employees set forth in TRW Carr. According to Huntington, the TRW Carr standard applies here, and the Board erred when it concluded under that standard that all of the technical employees in the E85 RADCON department was an appropriate unit for collective bargaining.

We need not decide whether the Board erred in applying the standard set forth in Specialty Healthcare, as Huntington submits, or even address whether Specialty Healthcare is consistent with the NLRA or our decision in Lundy Packing. This

is so because the Board's decision under the TRW Carr standard is supported by substantial evidence.

Under the TRW Carr standard, when technical employees work in similar jobs and have similar working conditions and benefits, the smallest appropriate unit for a group of technical employees must include all technical employees similarly employed. See Western Electric, 268 NLRB 351, 352 (1983) ("In general, the smallest appropriate unit of technical employees working in similar jobs with similar working conditions and benefits comprises all such technical employees.); TRW Carr, 266 NLRB at 326 ("When technical employees work in similar jobs and have similar working conditions and benefits, the only appropriate unit for a group of technicals must include all such employees similarly employed."). Thus, while the Board has found units of some, but not all, similarly situated technical employees to be inappropriate, it has also found a smaller unit to be appropriate when the petitioned-for technical unit possesses a sufficiently distinct community of interest apart from other technical units to warrant their establishment as a separate appropriate unit. See Western Electric, 268 NLRB at 352 ("Although a unit of less than all professional employees may be appropriate if that unit consists of a readily identifiable group with distinct skills and functions, the Board will not certify an arbitrarily defined segment of an employer's

- 46 -

similarly situated professionals."); TRW Carr, 266 NLRB at 326 n.4 ("[I]t is the Board's policy to grant a unit including some, but not all, technical employees only when the employees in the requested unit possess a sufficiently distinct community of interest apart from other technicals to warrant their establishment as a separate appropriate unit.").

In this case, it was within the discretion of the Board to find that the technical employees in the E85 RADCON department possessed a sufficiently distinct community of interest apart from other technical employees at the shipyard to warrant their establishment as a separate bargaining unit. First, the RCTs perform--with the integrated support of calibration technicians, laboratory technicians, and RCT trainees in the E85 RADCON department--the unique function of providing independent radiological oversight at the shipyard. No employees outside of the E85 RADCON department perform that task. The E85 RADCON technical employees are also distinct from other technical employees because they possess unique skills, have distinct job functions, are qualified to use specialized tools and equipment, have separate supervision, and do not temporarily interchange with other technical employees.

The E85 RADCON technical employees' work contacts with other technical employees, and their level of functional integration, is not so substantial as to negate their separate

and distinct community of interest.  The RCTs' work contacts with technical employees outside the E85 RADCON department are limited to subjecting them to the same radiological screening that other employees receive.  Employees in technical classifications outside of the E85 RADCON department perform tasks that are directly related to production, as opposed to radiological safety, and the E85 RADCON technical employees are not part of the production work flow.  In sum, the technical employees in the E85 RADCON department perform a radiological safety function that is sufficiently distinct from all other employees at the shipyard to warrant their having a separate bargaining unit.

In support of its contention that the only appropriate bargaining unit must include all of Huntington's technical employees, Huntington heavily relies on two cases in which the Board found that units not including all of the employer's technical employees were not appropriate.  Both cases involved RCTs at Westinghouse Electric Corporation's Naval Reactors Facility (NRF) at the National Reactor Testing Station in Idaho Falls, Idaho.  Westinghouse Elec. Corp., 137 NLRB 332 (1962) (Westinghouse I), and Westinghouse Elec. Corp., 300 NLRB 834 (1990) (Westinghouse II).  According to Huntington, our case is controlled by the Westinghouse cases because Huntington's RCTs

perform similar, if not identical, duties at its facility as did the employees at issue in the Westinghouse cases.

In Westinghouse I, the union sought to establish two units of technical employees, excluding industrial hygiene technicians among others. 137 NLRB at 332.[10] The Board found that the petitioned-for units were not "functionally distinct or homogenous groups of employees, [or] administrative or departmental units." Id. at 337. In so finding, the Board explained that NRF was "one big scientific laboratory for the development and simulation of scientific problems, and the analysis and discovery of answers to those problems." Id. at 334. Consequently, the Board found that the "technical functions of NRF [were] thoroughly integrated," that the skills of all the technical employees were "quite similar," that technical employees all "receive the same training course," and that the petitioned-for employees were not a "departmental unit." Id. at 337. The Board concluded that all of the NRF's technical employees "must be taken together as constituting an appropriate unit." Id.

In Westinghouse II, the RD found a bargaining unit of RCTs and chemistry technicians, excluding other technical employees,

---

[10] The industrial hygiene technicians in Westinghouse I performed a radiological control function similar to the RCTs at Huntington's shipyard. 137 NLRB at 336.

to be appropriate. 300 NLRB at 834. On review, the Board found that that unit was not appropriate. Id. at 835. The Board heavily relied on its earlier decision in Westinghouse I concerning the functional integration of the technical employees. Id. Thus, the Board found that radiological control was not a task "discrete from the [e]mployer's major service" of handling and processing nuclear material and operating reactors. Id. According to the Board, this control function required RCTs to have "close contact with other technical employees" and provide them with "direct support services." Id. The Board further noted that the record concerning the working conditions of RCTs and other technical employees was "strikingly similar" to the facts presented in Westinghouse I. Id. Consequently, the Board found no grounds for departing from its earlier holding and concluded that only a comprehensive unit of technical employees was appropriate at the NRF. Id.

The Board distinguished the Westinghouse cases from Huntington's case. The Board noted that, although all three cases involved RCTs who performed similar functions, the similarity between Huntington's case and the Westinghouse cases ended there. The Board observed that the overall technical work force at Huntington and Westinghouse is quite different, due in large measure to the substantial differences between running a nuclear research and training lab, as in the Westinghouse cases,

and operating a shipyard that builds and refurbishes aircraft carriers and submarines, as in Huntington's case. In the Westinghouse cases, the RCTs provided radiological safety for a relatively small complement of technical employees, all working near nuclear reactors and materials. In contrast, in Huntington's case, a large proportion of its shipyard is engaged in non-nuclear construction, so hundreds of its technical employees require no radiological oversight, and it is undisputed that many employees are not even qualified to enter nuclear work areas.

Moreover, the Board observed that the amount of radiological oversight that is required varies substantially over the course of work on any given ship at the Huntington shipyard, and there is a period of several years at the beginning of new ship construction where no oversight is necessary at all. In contrast, the Board explained, in the Westinghouse cases, the RCTs' "presence is an absolute necessity at all stages of some functions of [the] facilities." Northrop Grumman Shipbuilding, Inc., 2011 WL 7121890, at *7 (citation and internal quotation marks omitted). Unlike the RCTs in the Westinghouse cases, Huntington's RCTs do not provide direct support to or have close contact with the other technical classifications. To the contrary, the Board noted, Huntington's

RCTs have little or no regular working contact with a majority of the other technical employees.

The Board also observed that the absence of even temporary interchange between RCTs and other technical classifications at the Huntington shipyard further distinguished this case from the Westinghouse cases, where there was such temporary interchange. In light of all the meaningful distinctions between Huntington's case and the Westinghouse cases, the Board concluded that the Westinghouse cases were not controlling.

We agree with the Board that the Westinghouse cases are distinguishable from our case, for the reasons persuasively set forth by the Board. Accordingly, we hold that the Board's decision, that under the standard set forth in TRW Carr, the technical employees in the E85 RADCON department share a community of interest sufficiently distinct from the other technical employees at Huntington's shipyard, is supported by substantial evidence.

IV

Having determined that Enterprise and Huntington do not prevail on their statutory challenges under the NLRA, we must proceed to the constitutional question presented: Whether the President's three appointments to the Board on January 4, 2012

are valid under the Recess Appointments Clause of the United States Constitution.

A

Section 3(b) of the NLRA provides in relevant part:

The Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise. . . . A vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board, except that two members shall constitute a quorum of any group designated pursuant to the first sentence hereof.

29 U.S.C. § 153(b). In New Process Steel, the Supreme Court addressed the question of whether, under § 3(b), following a delegation of the Board's powers to a three-member group, two members may continue to exercise that delegated authority once the group's (and the Board's) membership falls to two. 130 S. Ct. at 2638. The Supreme Court held that the two remaining Board members could not exercise such authority. Id. The Court identified three reasons supporting its reading of § 3(b).

First, the Court noted that reading the first sentence of § 3(b) to require "the Board's delegated power be vested continuously in a group of three members [was] the only way to harmonize and give meaningful effect to all of the provisions in § 3(b)." Id. at 2640. Second, the Court noted that,

if Congress had intended to authorize two members alone to act for the Board on an ongoing basis, it could have said so in straightforward language.

- 53 -

> Congress instead imposed the requirement that the Board delegate authority to no fewer than three members, and that it have three participating members to constitute a quorum. Those provisions are at best an unlikely way of conveying congressional approval of a two-member Board.

Id. at 2641. Third, the Court noted that its interpretation of § 3(b) was consistent with the longstanding practice of the Board. Id. at 2641-42.

At the time it issued its 2012 decisions in the unfair labor practices cases currently before us,[11] the Board had two properly seated members, namely, Mark Gaston Pearce and Brian Hayes, both of whom were confirmed by the Senate on June 22, 2010. Its third member, Craig Becker, had been appointed to a recess term that ended on January 3, 2012. As of that date, the Board lost its quorum. The President, purportedly acting pursuant to the Recess Appointments Clause, appointed Sharon Block, Richard Griffin, Jr., and Terence Flynn (who has since resigned his seat) to the Board the next day, January 4, 2012.[12]

The lawfulness of the Board's 2012 unfair labor practices decisions in both the Enterprise and Huntington cases turns on

---

[11] April 2012 in Enterprise's case, and August 2012 in Huntington's case.

[12] Block replaced Becker on the Board. Flynn filled the seat which became vacant on August 27, 2010 when Peter Schaumber's term expired. Griffin filled Wilma Leibman's seat, which became vacant when her term expired on August 27, 2011.

whether the President's appointments pursuant to the Recess Appointments Clause are valid.[13] If the appointments are invalid, the Board's quorum requirement was not met at the time it issued the 2012 decisions. Both Enterprise and Huntington challenge these Presidential appointments; the Board asserts that the President validly exercised his delegated authority. We begin our discussion by setting forth the governing interpretative law and the relevant constitutional provisions at issue.[14]

---

[13] Understandably, neither Enterprise nor Huntington challenge the validity of Becker's appointment to the Board under the Recess Appointments Clause. In NLRB v. New Vista Nursing and Rehabilitation, LLC., 2013 WL 2099742, at **11-30 (3d Cir. May 16, 2013), the court held that Becker's appointment was invalid under the Recess Appointments Clause. The validity of Becker's appointment is not before us because direct judicial review of Board representation decisions is unavailable; rather, only indirect review of such decisions is available, and this is obtained through a refusal to bargain and the filing of an unfair labor practices charge. NLRB v. Kentucky River Cmty. Care Inc., 532 U.S. 706, 709 (2001); AFL v. NLRB, 308 U.S. 401, 409-11 (1940). Thus, the only Board decisions under direct review in these cases are the ones issued in the unfair labor practices cases in 2012.

[14] Neither Enterprise nor Huntington argue that § 3(b)'s three-member-composition requirement deprives us of jurisdiction to review the Board's 2012 unfair labor practices decisions in the cases before us. However, as a federal appellate court, we have an obligation to satisfy ourselves that we have jurisdiction to review these decisions. See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) (observing that "every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it") (citation and (Continued)

When interpreting the text of the Constitution, we begin with the presumption that every word in the Constitution has independent meaning, "that no word was unnecessarily used, or needlessly added." Wright v. United States, 302 U.S. 583, 588 (1938). Moreover, we must bear in mind in our evaluation of the constitutional provisions at issue that "'[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from

internal quotation marks omitted). In Arbaugh v. Y & H Corporation, 546 U.S. 500 (2006), the Supreme Court set forth a "readily administrable bright line" jurisdictional standard. Id. at 516. "If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue." Id. at 515–16. In New Process Steel, the Supreme Court held that § 3(b)'s three-member-composition requirement mandated that a delegee group maintain a membership of three in order to exercise the delegated authority of the Board. 130 S. Ct. at 2639–42. Such a requirement is a threshold limitation on the scope of the Board's delegated power under the NLRA, and, therefore, we are satisfied that we have jurisdiction to determine whether there is any reason for which the delegee group consists of fewer than three members, including whether one member is invalidly appointed under the Recess Appointments Clause. See New Vista Nursing, at *5 ("By explaining that three members are required in order to exercise the delegated authority of the Board, . . . the Supreme Court has in essence declared that the three-member-composition requirement goes directly to the board's power to hear a case, which is exactly what jurisdictional questions relate to") (citations and internal quotation marks omitted); Noel Canning, 705 F.3d at 497 ("[T]he objections before us concerning lack of a quorum raise questions that go to the very power of the Board to act.").

technical meaning.'" District of Columbia v. Heller, 554 U.S. 570, 576 (2008) (quoting United States v. Sprague, 282 U.S. 716, 731 (1931)). The "[n]ormal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." Id. at 576-77.

The Appointments Clause of the Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the [S]upreme Court, and all other Officers of the United States . . . ." U.S. Const. art. II, § 2, cl.2.[15] The shared responsibility between the President and the Senate was created to act as a "check upon a spirit of favoritism in the President," and to prevent the appointment of "unfit characters." The Federalist No. 76, at 392 (Alexander Hamilton) (Carey and McClellan ed., 1990).

The Recess Appointments Clause was created to supplement the Appointments Clause. The Federalist No. 67, at 350 (Alexander Hamilton). The clause states that the President "shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which

---

[15] The parties agree that members of the Board are "Officers of the United States" within the meaning of the Appointments Clause.

shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl.3. "Recesses can generally be classified into two categories: intersession recesses--or, recesses that occur between two sessions of Congress--and intrasession recesses--or recesses that occur within one particular session of Congress." Alexander Wolf, Taking Back What's Theirs: The Recess Appointments Clause, Pro Forma Sessions and A Political Tug-of-War, 81 Fordham L. Rev. 2055, 2062 (2013) (footnotes omitted). Stated differently, an intersession break of the Senate refers to the period of time between an adjournment sine die and the start of the Senate's next session, while an intrasession break refers to the period of time between a non-sine die adjournment and the time the Senate reconvenes.

The Recess Appointments Clause has two important features relevant here. First, it was designed to ensure that the government would remain in operation during times when the Senate would be unable to advise and consent to a nomination. Id. at 2062-63. When the Constitution was written, intersession recesses regularly lasted between six and nine months. Michael B. Rappaport, The Original Meaning of the Recess Appointments Clause, 52 UCLA L. Rev. 1487, 1498 (2005). Consequently, in the absence of a recess appointments provision, there was a genuine possibility that an important government position, for example, a cabinet post, would remain vacant for a long period of time,

because recalling the Senate, U.S. Const. art. II, § 3, was not an easy task considering the slow transportation of the late 1700s. Rappaport, 52 UCLA L. Rev. at 1498. Second, and more importantly, the Recess Appointments Clause was designed to prevent the President from unilaterally exercising appointment power, thereby preserving the separation of the powers between the Legislative and Executive Branches. Id. at 1511 n.68; cf. Freytag v. C.I.R., 501 U.S. 868, 884 (U.S. 1991) ("The Framers understood, however, that by limiting the appointment power, they could ensure that those who wielded it were accountable to political force and the will of the people."); cf. id. (noting that the Appointments Clause "bespeaks a principle of limitation by dividing the power to appoint the principal federal officers—ambassadors, ministers, heads of departments, and judges—between the Executive and Legislative Branches").

There was no debate surrounding the inclusion of the Recess Appointments Clause into the Constitution, and the clause was included in the Constitution without a single dissenting vote. Wolf, 81 Fordham L. Rev. at 2063. Moreover, it is clearly established that the phrase "End of [the Senate's] next Session," U.S. Const. art. II, § 2, cl.3, means "the end of the session following the final adjournment of the current session of Congress. Thus, an appointment made during the first session of a particular Congress will not expire until the end of the

second session of that Congress." Wolf, 81 Fordham L. Rev. at 2064 (footnotes, citations, and internal quotation marks omitted).

Under the Adjournments Clause, "neither [chamber], during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days." U.S. Const. art. I, § 5, cl.4.[16] An adjournment of more than three days by one chamber of Congress thus requires the consent of the other chamber. Such an adjournment usually is accomplished through the passage of concurrent resolutions permitting such adjournment. Wolf, 81 Fordham L. Rev. at 2065. The parties agree that the Senate was not adjourned pursuant to the Adjournments Clause when the President made the three 2012

---

[16] "Adjourn" or "adjournment" is used in the Constitution on five more occasions (in four clauses): (1) Article I, § 5, Clause 1 (allowing a minority of members to "adjourn from day to day"); (2) Article I, § 7, Clause 2 ("If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law"); (3) Article I, § 7, Clause 3 ("Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States"); and (4) Article II, § 3 ("[The President] may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper.").

recess appointments to the Board at issue in the cases before us.[17]

The Take Care Clause requires the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. This clause's application here is subtle. On the one hand, it may be said that the Take Care Clause requires the President to ensure that the laws of the United States, such as the NLRA, be faithfully executed and that the use of pro forma sessions prevents such execution. On the other hand, it may be said that the use of pro forma sessions ensures that the President will seek the advice and consent of the Senate in exercising his appointment power.

C

In pressing their respective constitutional arguments before this court, the parties take umbrage under authority supporting their position. The Board's view is supported by decisions out of the Second, Ninth, and Eleventh Circuits. See Evans v. Stephens, 387 F.3d 1220 (11th Cir. 2004); United States v. Woodley, 751 F.2d 1008 (9th Cir. 1985); United States v.

---

[17] The use of pro forma sessions every three days allows one chamber of Congress effectively to adjourn when the other chamber will not consent to an adjournment. A Senate pro forma session usually begins with a single senator gaveling-in the session and concludes with the same senator ending the session only several seconds or minutes later. Wolf, 81 Fordham L. Rev. at 2067.

<u>Allocco</u>, 305 F.2d 704 (2d Cir. 1962). Two recent decisions support the position pressed by Enterprise and Huntington. <u>See</u> <u>New Vista Nursing</u>, 2013 WL 2099742; <u>Noel Canning</u>, 705 F.3d 490. An analysis of the Eleventh Circuit's decision in <u>Evans</u>, the D.C. Circuit's decision in <u>Noel Canning</u>, and the Third Circuit's decision in <u>New Vista Nursing</u> is helpful in resolving the constitutional question before us.

1

In <u>Evans</u>, between February 12 and February 23, 2004, the Senate took a break in their session. 387 F.3d at 1221. During that break, on February 20, the President, relying on the Recess Appointments Clause, appointed William Pryor, Jr., to the Eleventh Circuit Court of Appeals. <u>Id.</u> The plaintiffs in <u>Evans</u> challenged the authority of Judge Pryor to act as a United States Circuit Judge. <u>Id.</u> at 1222.

The <u>Evans</u> court first held that a recess appointment to an Article III court is permitted under the Recess Appointments Clause. <u>Id.</u> at 1222-24. The court also held that the term "the Recess" also includes an intrasession break. <u>Id.</u> at 1224-26. In so holding, the court first indicated that the Senate's twelve-day break fit within the definition of a "recess" that was "in use when the Constitution was ratified: the dictionary definitions that have been called to our attention (or that we

- 62 -

have found) did not, for example, speak of a minimum time." Id. at 1224.

The Evans court then rejected the argument that the term "the Recess" limits the opportunity to make recess appointments to one particular recess, that is, the recess at the end of a session. Id. Rather, the court observed, the term "the Recess" could refer to both intersession as well intrasession breaks. Id. at 1224-45.

The court in Evans was not persuaded that the Framers' use of the term "adjournment" in other clauses and not the term "the Recess" necessarily limited the meaning of the term "the Recess" to a break at the end of a session. Id. at 1225. The court stated that, "[i]nstead of describing a block of time, the term 'Adjournment' in the Constitution can be read to signify a parliamentary action: Congress's taking or having taken a break." Id.

The Evans court noted that the "Constitution, on its face, does not establish a minimum time that an authorized break in the Senate must last to give legal force to the President's appointment power under the Recess Appointments Clause," and the court elected not to establish a minimum time. Id. The court did observe that, although a President had not before appointed a judge to an Article III court during an intrasession break as short as the one in Judge Pryor's case, appointments to other

offices requiring Senate confirmation had been made during intrasession breaks of about this length or shorter.  Id.

The Evans court noted that its interpretation of the term "the Recess" was consistent with one of the main purposes behind the Recess Appointments Clause.  The court noted that, to assure the proper functioning of the government, both intrasession breaks and intersession breaks were permitted, because, in theory, an intersession break could be shorter than an intrasession break.  Id. at 1226.

The Evans court then turned to the question of whether the vacancy needs to "happen" or "arise" during "the Recess" in order to be filled.  The court concluded that such vacancies can be filled if they happen to exist during a recess, id. at 1226-27, citing the Ninth Circuit's decision in Woodley and the Second Circuit's decision in Allocco.  Id. at 1226.  The court agreed that the phrase "that may happen" is subject to more than one interpretation, noting that the word "happen" can be defined as "befall," which can mean "happen to be."  Id. (citation and internal quotation marks omitted).  Such a definition, which the court described as the "most accepted," does not contradict the plain meaning rule.  Id.

The Evans court also relied on the past practice of early Presidents (in particular, President Washington) making recess appointments that originated while the Senate was in session.

_Id._ Finally, the court noted that, interpreting the phrase "that may happen" to "prohibit the President from filling a vacancy that comes into being on the last day of a Session but to empower the President to fill a vacancy that arises immediately thereafter (on the first day of a recess) contradicts what we understand to be the purpose of the Recess Appointments Clause: to keep important offices filled and the government functioning." _Id._ at 1227.

2

In _Noel Canning_, the D.C. Circuit held that the President's three January 4, 2012 appointments to the Board were invalid under the Recess Appointments Clause. 705 F.3d at 499-514. In its decision, the court first tackled the meaning of the term "the Recess" as used in the Recess Appointments Clause. The court concluded that the term "the Recess" refers to the intersession break of the Senate, that is, the period between sessions of the Senate when the Senate is by definition not in session and therefore unavailable to receive and act upon nominations from the President. _Id._ at 499-507. The court relied on eight key points to support its conclusion.

First, the court in _Noel Canning_ emphasized that the use of the definite article "'the'" suggested "specificity." _Id._ at 500. According to the court, as a "matter of cold, unadorned logic, it makes no sense to adopt the Board's proposition that

when the Framers said 'the Recess,' what they really meant was 'a recess.'" Id.

In support of its definite/indefinite article distinction, the court in Noel Canning observed that on six occasions the Constitution uses some form of the verb "adjourn" or the noun "adjournment" to refer to breaks in the proceedings of one or both houses of Congress, and in each case, an indefinite article is used. Id. In contrast, the two uses of "Recess" (once in the Recess Appointments Clause and the other in the original Senate Vacancies Clause, U.S. Const. art. I, § 3, cl.2, superseded by id. Amend. XVII) contain a definite article ("the"). According to the court, this "points to the inescapable conclusion that the Framers intended something specific by the term "'the Recess,' and that it was something different than a generic break in proceedings." Id.

Second, the Noel Canning court looked to the structure of the Recess Appointments Clause. The court noted that the clause "sets a time limit on recess appointments by providing that those commissions shall expire 'at the End of their [the Senate's] next Session.'" Id. The court observed that the structure of the clause was such that the there was a difference between the term "'the Recess'" and the term "'Session.'" Id. Accordingly, "[e]ither the Senate is in session, or it is in the recess. If it has broken for three days within an ongoing

session, it is not in 'the Recess.'"  Id.  Since it was "universally accepted that 'Session' here refers to the usually two or sometimes three sessions per Congress . . . , 'the Recess' should be taken to mean only times when the Senate is not in one of those sessions."  Id.

Third, the Noel Canning court observed that its interpretations of the terms "the Recess" and "Session" was supported by constitutional history.  The court cited to The Federalist No. 67, where Alexander Hamilton noted that recess appointments would expire at the end of the ensuing session of Congress.  Id.  For there to be an ensuing session, the court stated, recess appointments must be "made at a time when the Senate was not in session–that is, when it was in 'the Recess.'"  Id. at 500-01.

Fourth, the Noel Canning court noted that historical practice supported its interpretation of the term "the Recess." The court observed that there were no intrasession recess appointments for the first eighty years following the Constitution's ratification, id. at 501, and there were only three documented intrasession recess appointments prior to 1947. Id. at 502.  According to the court, the "infrequency of intrasession recess appointments during the first 150 years of the Republic suggests an assumed absence of the power to make

such appointments." Id. (citation, alterations, and internal quotation marks omitted).

Fifth, the Noel Canning court indicated that the Constitution's overall appointments structure provided additional support for its position. According to the court, the Framers emphasized that the "recess appointment power served only as a stopgap for times when the Senate was unable to provide advice and consent." Id. at 502. The court quoted from Hamilton's The Federalist No. 67, where Hamilton observed that advice and consent "'declares the general mode of appointing officers of the United States,' while the Recess Appointments Clause serves as 'nothing more than a supplement to the other for the purpose of establishing an auxiliary method of appointment, in cases to which the general method was inadequate.'" Id. at 502-03 (quoting The Federalist No. 67, at 350). Such a structure was important to the Framers, the court observed, because appointments made pursuant to the advice and consent of the Senate under the Appointments Clause served to prevent Presidential favoritism and the appointment of the unqualified. Id. at 503.

By contrast, to keep the government functioning during lengthy intersession periods (typically six to nine months) where it was difficult to recall the Senate, the Framers created a supplemental method for appointments. Id. The court noted,

however, that the Framers placed strict limits on the execution

of this supplemental method.  Id.  According to the court,

> [i]t would have made little sense to extend this
> "auxiliary" method to any intrasession break, for the
> "auxiliary" ability to make recess appointments could
> easily swallow the "general" route of advice and
> consent.  The President could simply wait until the
> Senate took an intrasession break to make
> appointments, and thus "advice and consent" would
> hardly restrain his appointment choices at all.

Id.

Seventh, the court in Noel Canning observed that there was

no other plausible interpretation of the term "the Recess."  The

term could not refer to all breaks, otherwise the President

could make an appointment during a Senate lunch break.  Id.  The

court also noted that this interpretation could not "explain the

use of the definite article 'the,' the singular 'Recess' in the

Clause, or why the Framers used 'adjournment' differently from

'Recess.'"  Id.

The next interpretation addressed by the Noel Canning court

was that the term "the Recess" refers to some substantial

passage of time.  This interpretation was adopted by Attorney

General Harry Daugherty in 1921.  In an opinion, Attorney

General Daugherty argued that "[t]o give the word 'recess' a

technical and not a practical construction, is to disregard

substance for form."  33 Op. Att'y Gen. 20, 22 (1921).  In this

opinion, Attorney General Daugherty did not put an exact time on

the length of the break necessary for a recess, stating that "[i]n the very nature of things the line of demarcation can not be accurately drawn." Id. at 25. However, Attorney General Daugherty rejected the proposition that an adjournment for five or ten days met his definition, though he did conclude that a break of twenty-eight days did. Id.

The Noel Canning court rejected Attorney General Daugherty's vague alternative in favor of the clarity of the intersession interpretation. According to the court, "the inherent vagueness of Daugherty's interpretation counsels against it," because "the Framers would not likely have introduced such a flimsy standard." Id. at 504.

The court in Noel Canning likewise rejected the notion that the term "the Recess" refers to any adjournment of more than three days pursuant to the Adjournments Clause, because such an interpretation lacked "any constitutional basis." According to the court,

> [t]he Framers did not use the word "adjournment" in the Recess Appointments Clause. Instead, they used "the Recess." The Adjournments Clause and the Recess Appointments Clause exist in different contexts and contain no hint that they should be read together. Nothing in the text of either Clause, the Constitution's structure, or its history suggests a link between the Clauses. Without any evidence indicating that the two Clauses are related, we cannot read one as governing the other. We will not do violence to the Constitution by ignoring the Framers' choice of words.

Id.

The <u>Noel Canning</u> court also rejected an interpretation adopted by the Office of Legal Counsel in 2012. Under this interpretation of the term "the Recess," the President has discretion to determine when the Senate is in recess. <u>See</u> <u>Lawfulness of Recess Appointments During a Recess of the Senate</u> <u>Notwithstanding Periodic Pro Forma Sessions</u>, 36 Mem. Op. O.L.C. 1, 23 (2012) ("[T]he President therefore has discretion to conclude that the Senate is unavailable to perform its advise-and-consent function and to exercise his power to make recess appointments."). The court in <u>Noel Canning</u> rejected this interpretation because to allow

> the President to define the scope of his own appointments power would eviscerate the Constitution's separation of powers. The checks and balances that the Constitution places on each branch of government serve as "self-executing safeguard[s] against the encroachment or aggrandizement of one branch at the expense of the other." <u>Buckley v. Valeo</u>, 424 U.S. 1, 122, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). An interpretation of "the Recess" that permits the President to decide when the Senate is in recess would demolish the checks and balances inherent in the advice-and-consent requirement, giving the President free rein to appoint his desired nominees at any time he pleases, whether that time be a weekend, lunch, or even when the Senate is in session and he is merely displeased with its inaction.

705 F.3d at 504.

Eighth, the <u>Noel Canning</u> court rejected the analysis of the Eleventh Circuit's decision in <u>Evans</u>. The court observed that

the Evans court's analysis failed to recognize one of the important purposes of the Recess Appointments Clause, that is, that the clause allows the President to fill a vacancy only when the Senate cannot provide advice and consent. Id. at 505. The Noel Canning court also rejected the implication of the Evans court's analysis–that the term "the Recess" applies to any recess. Id. Finally, the Noel Canning court observed that the court in Evans failed to distinguish between "adjournment" and "recess," "rendering the latter superfluous and ignoring the Framers' specific choice of words." Id. at 506.

Summarizing its holding concerning the meaning of the term "the Recess," the court in Noel Canning stated:

> Finally, we would make explicit what we have implied earlier. The dearth of intrasession appointments in the years and decades following the ratification of the Constitution speaks far more impressively than the history of recent presidential exercise of a supposed power to make such appointments. Recent Presidents are doing no more than interpreting the Constitution. While we recognize that all branches of government must of necessity exercise their understanding of the Constitution in order to perform their duties faithfully thereto, ultimately it is our role to discern the authoritative meaning of the supreme law.
>
> As Chief Justice Marshall made clear in Marbury v. Madison, "[i]t is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each." 5 U.S. (1 Cranch) at 177. In Marbury, the Supreme Court established that if the legislative branch has acted in contravention of the Constitution, it is the courts that make that

determination.  In <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, the Supreme Court made clear that the courts must make the same determination if the executive has acted contrary to the Constitution.  343 U.S. 579, 72 S. Ct. 863, 96 L. Ed. 1153 (1952).  That is the case here . . . .

In short, we hold that "the Recess" is limited to intersession recesses.

705 F.3d at 506.

Although the court in <u>Noel Canning</u> needed to go no further, it went on to address the scope of the meaning of the word "happen" in the Recess Appointments Clause.  The court indicated that two interpretations were available.  The first, pressed by Noel Canning, was that "happen" means "'arise'" or "'begin'" or "'come into being.'"  <u>Id.</u> at 507.  The second, pressed by the Board, was that "happen" means "'happen to exist.'"  <u>Id.</u>  The court agreed with Noel Canning's interpretation.  <u>Id.</u> at 507-14.

The <u>Noel Canning</u> court first observed that the word "happen" cannot logically mean vacancies that happened to exist during "the Recess," because such a construction rendered the phrase "that may happen" unnecessary.  <u>Id.</u> at 507.  The court next observed that its interpretation of the word "happen" was consistent with the understanding of the word contemporaneous with the Constitution's ratification, citing to a dictionary at the time of ratification defining the word "happen" as "[t]o fall out; to chance; to come to pass."  <u>Id.</u> (citation and internal quotation marks omitted).  The court posited that a

- 73 -

"vacancy happens, or comes to pass, only when it first arises, demonstrating that the Recess Appointments Clause requires that the relevant vacancy arise during the recess." Id. (alterations and internal quotation marks omitted).

The Noel Canning court next turned to the structure of the Constitution to support its view. The court noted that it "would have made little sense to make the primary method of appointment the cumbersome advice and consent procedure contemplated by that Clause if the secondary method would permit the President to fill up all vacancies regardless of when the vacancy arose." Id. at 508. Otherwise, the court indicated, the President could sidestep the Appointments Clause altogether by simply waiting for a recess. Id.

The court in Noel Canning also observed that its interpretation of the word "happen" was consistent with other uses of the term in the Constitution. See id. (noting that the Senate Vacancies Clause, which provided at the time of the adoption of the Constitution "if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies," U.S. Const. art. I, § 3, cl.2, superseded by id. Amend. XVII, would make no sense if it refers to vacancies that happen to exist at the time of a recess).

The court in <u>Noel Canning</u> also observed that its interpretation of the word "happen" was consistent with the earliest Presidential interpretation of the word, examining the actions of President Washington. According to the court, President Washington understood the recess appointment power to extend only to vacancies that arose during a Senate recess. <u>Id.</u> Specifically, President Washington followed a practice that if not enough time remained in the session to ask a person to serve in an office, he would nominate a person without the nominee's consent, and the Senate would confirm the individual before recessing. <u>Rappaport</u>, 52 <u>UCLA L. Rev.</u> at 1522. Then, if the person declined to serve during the recess, thereby creating a new vacancy during the recess, President Washington would fill the position using his recess appointment power. <u>Id.</u> "If President Washington and the early Senate had understood the word 'happen' to mean 'happen to exist,' this convoluted process would have been unnecessary." <u>Noel Canning</u>, 705 F.3d at 508.

The <u>Noel Canning</u> court also distinguished <u>Evans</u>, <u>Woodley</u>, and <u>Allocco</u> on the basis that these decisions did not focus their analyses on the original public meaning of the word "happen." <u>Id.</u> The court also noted that modern scholarship had demonstrated that President Washington's exercise of the appointment power was an example of "'the practice of appointing an individual without his consent and then, if he turns down the

appointment during the recess, making a recess appointment at that time.'" Id. at 509-10 (quoting Rappaport, 52 UCLA L. Rev. at 1522 n.97).

The Noel Canning court also rejected the notion that its interpretation of the word "happen" ran afoul of the Take Care Clause. The court noted that the constitutional dilemma raised by the case was an easy fix-Congress could provide that a Board member's service extends until the qualification of a successor, or provide for action by less than the current quorum, or deal with any inefficiencies in some other manner. Id. at 511.

Applying its interpretation of the word "happen," the court in Noel Canning held that the relevant vacancies did not arise during the intersession break of the Senate. Id. at 512. The three Board seats that the President filled on January 4, 2012 had become vacant on August 27, 2010, August 27, 2011, and January 3, 2012, respectively. On August 27, 2010, the Senate was in the midst of an intrasession break, so the vacancy that arose on that date did not arise during "the Recess" for purposes of the Recess Appointments Clause. Id. Similarly, the Senate was in an intrasession break on August 27, 2011, so the vacancy that arose on that date also did not qualify for a recess appointment. Id. The seat formerly occupied by Becker became vacant at the end of the Senate's session on January 3, 2012. According to the court, it did not "'happen during the

Recess of the Senate'" because the Senate did not take an intersession recess between the first and second sessions of the 112th Congress.  Id.

3

In New Vista Nursing, the court addressed the question of whether the President's March 27, 2010 appointment of Becker to the Board was valid under the Recess Appointments Clause.  2013 WL 2099742, at **11-30.  On March 26, 2012, the Senate "adjourned" for a two-week period.  Id. at *6 (citation, alterations, and internal quotation marks omitted).  The court in New Vista Nursing held that Becker's appointment was invalid under the Recess Appointments Clause because the Recess Appointments Clause only applies to intersession breaks.  Id. at **11-30.

In beginning its analysis, the court in New Vista Nursing identified three plausible definitions for the phrase "the Recess of the Senate."  Id. at *13.  According to the court, the phrase "the Recess of the Senate" could refer to: (1) intersession breaks as the court held in Noel Canning; (2) intrasession breaks that last at least ten days as developed in Evans and Attorney General Daugherty's opinion; or (3) any time in which "the Senate is not open for business and is unavailable to provide its advice and consent" as developed by the Office of Legal Counsel in 2012.  Id.

In deciding which definition to adopt, the court in <u>New Vista Nursing</u> first examined dictionaries from the time of the Constitution's ratification. The court noted that such dictionaries were inconclusive, because the definitions of "recess" in Founding-era dictionaries supported each definition of the phrase "the Recess of the Senate." <u>Id.</u> at **13-14; <u>id.</u> at *13 (noting that Samuel Johnson's 1785 dictionary defined "recess" to mean "retirement; retreat; withdrawing; secession" as well as "departure" and "removal to distance") (citation, alterations, and internal quotation marks omitted).

The <u>New Vista Nursing</u> court then examined the parliamentary practice of the English Parliament to see if it shed light on the meaning of the phrase "the Recess of the Senate," because the parliamentary procedures of the first Senate were based on the parliamentary procedures employed by the English Parliament. <u>Id.</u> at *14. English parliamentary procedure during the Founding era had three types of breaks: adjournments, prorogations, and dissolutions. <u>Id.</u> Adjournments were "continuances of the session from one day to another . . . and sometimes a fortnight or a month together." <u>Id.</u> (citation and internal quotation marks omitted). Prorogations were "continuances of the parliament from one session to another initiated by the king," <u>id.</u> (citation and internal quotation marks omitted), and dissolutions were "terminations of a Parliament initiated by the

- 78 -

king's order, his death, or a length of time that necessitated new elections before another Parliament could be convened." Id. (citation and internal quotation marks omitted).

The court in New Vista Nursing stated that it was "tempt[ed] to say" that the phrase "the Recess of the Senate" corresponded to a prorogation and, thus, the phrase "must refer only to terminations of sessions and the intersession breaks that follow them." Id. at *15. However, the court stopped short of such a conclusion because "adjournment," as used in the Constitution, did not mean the same thing to the Framers as it did to the English Parliament. Specifically, the Constitution employs "adjourn" and "adjournment" to refer to an intrasession break (e.g., U.S. Const. art. I, § 5, cl.1 (allowing a minority of members to "adjourn from day to day")), as well as an intersession break. See id. (noting that the Supreme Court in The Pocket Veto Case, 279 U.S. 655 (1929), adopted a definition of "adjournment" that included intrasession as well as intersession breaks).

Because the parliamentary procedure of the English Parliament proved inconclusive, the New Vista Nursing court turned to other historical sources, namely, numerous state constitutions and the practices of state legislatures and governors. Id. at *15-16. The court observed that this historical evidence demonstrated that, at the time of the

Constitution's ratification, the word "recess" had one of two meanings, "either intersession breaks only or intersession breaks plus long intrasession breaks," id. at *16, with legislatures preferring the former definition, while the governors preferred the latter. Id. While the court concluded that the historical evidence is unclear on whether "recess" refers to intersession breaks only or intersession breaks plus long intrasession breaks, the court made clear that the historical evidence does not support the unavailable-for-business definition. The court first noted that the historical evidence suggests that a break of considerable length is necessary to trigger a recess and that the unavailable-for-business definition does not require a break of any particular duration. Id. Second, the court noted that, at the time of the Constitution's ratification, a "recess" was "determined solely by when the legislature adjourned—rather than by some functionalist definition of when the body was unavailable for business." Id. at *17. The court could find no examples, and the Board had provided none, suggesting that the definition of the word "recess" turned on such factors "as whether members were required to attend, the legislative chamber was empty, and the body could receive messages." Id. Rather, whether there

was a "recess" turned on the "type, or possibly the duration, of the legislature's self-defined adjournment." Id.[18]

In trying to break the intersession/intrasession knot, the New Vista Nursing court addressed the significance of the definite article "the" in the phrase "the Recess of the Senate." The court observed that "the" might refer to a "specific thing," such an intersession break. Id. (citing Noel Canning). But the court also noted that "the" could refer to another specific thing, such as whenever the Senate was in recess. Id. (citing Evans). The court also observed that the Constitution used "the" in several different contexts. Id. (citing U.S. Const. art. I, § 3, cl.4 (stating that "[t]he Vice President . . . shall be President of the Senate"); art. I, § 3, cl.5 (stating that that the Senate shall select a President Pro Tempore "in the Absence of the Vice President"). Based on this evidence,

---

[18] The court in New Vista Nursing found additional faults in the unavailable-for-business definition. The court noted that the structure of the Appointments and Recess Appointments Clauses meant that the unavailable-for-business definition was "implausibl[e]," 2013 WL 2099742, at *19, because adopting this definition "would eviscerate the divided-powers framework the two Appointments Clauses establish." Id. The court noted that, if the Senate refused to confirm one of the President's nominations, then the President could circumvent the Senate's constitutional role simply by waiting for the Senate to adjourn for lunch or the evening; thus, the "exception of the Recess Appointments Clause would swallow the rule of the Appointments Clause." Id.

the court found the use of "the" in the phrase "the Recess of the Senate" to be "uninformative."  Id.

The court in New Vista Nursing then turned to the constitutional context of the phrase "the Recess of the Senate." Following the reasoning of Noel Canning, the court observed that the structure of the Appointments Clause and the Recess Appointments Clause was such that the Recess Appointments Clause is a "secondary, or exceptional, method of appointing officers, while the Appointments Clause provides the primary, or general, method of appointment."  Id.  According to the court, the "clauses thus reveal a constitutional preference for divided power over the appointments process, which is deviated from only in specified situations."  Id. (footnote omitted).  In support of this conclusion, the court discussed at length Hamilton's The Federalist No. 67.  Id. at *18.  Thus, the court posited that the main purpose of the Recess Appointments Clause was not, as the Evans court suggested, to enable the President to fill vacancies to assure the proper functioning of our government, but rather "to preserve the Senate's advice-and-consent power by limiting the president's unilateral appointment power."  Id. According to the court, ignoring the separation of powers between the Legislative and Executive Branches "neglect[ed] a central principle that underlies the two Appointments Clauses." Id. (footnote omitted).

The court in New Vista Nursing found further guidance in several relevant constitutional provisions. First, the court looked to the word "adjournment," a term the court noted that could refer to a break of any type or length. Id. at *20. The court observed that, "if the framers had intended for the president to be able to appoint officers during intrasession breaks, then the Recess Appointments Clause could have been worded differently, allowing recess appointments 'during the Adjournment of the Senate.'" Id. For this reason, the court concluded that the use of the word "recess" instead of "adjournment," meant that "recess" had a different meaning than "adjournment." Id. (citing Noel Canning).

To discern the meanings of the words "adjournment" and "recess," the court in New Vista Nursing examined such words in their constitutional context. The court noted that the lack of temporal guideposts in the Constitution concerning the phrase "the Recess of the Senate." Id. at 21. The court rejected the notion that the Adjournments Clause, which requires either chamber of Congress to obtain the consent of the other to adjourn for more than three days, U.S. Const. art. I, § 5, cl.4, provides such a guidepost for the Recess Appointments Clause, because "'[n]othing in the text of either Clause, the Constitution's structure, or its history suggests a link between the Clauses.'" New Vista Nursing, 2013 WL 2099742, at *21

- 83 -

(quoting Noel Canning, 705 F.3d at 504). Without the hint of a connection, the court noted that there was "no reason to believe that the Adjournment Clause's duration requirement controls the meaning of the Recess Appointment[s] Clause." Id. The court further noted that "nothing in the Constitution establishe[d] the necessary length of an intrasession break that would constitute a recess." Id. (footnote omitted).

The court in New Vista Nursing then turned to the durational component of the Recess Appointments Clause–that the term of the officer recess-appointed expired "at the End of [the Senate's] next Session," U.S. Const. art. II, § 2, cl.3. The court noted that all parties agreed that a session of the Senate begins at the Senate's first convening and ends either when the Senate adjourns sine die or automatically expires at noon on January 3 in any given year. New Vista Nursing, 2013 WL 2099742, at *22. According to the court, the expiration of an officer's term "'at the End of [the Senate's] next Session'" implies that the appointment is made during a period between sessions. Id. Such implication arises because the appointment is designed to last only as long as it would normally take to confirm the President's nomination. Id. The court noted that "[l]imiting the duration to a single opportunity follows from the auxiliary nature of the Clause" and is consistent with the

principle that "the Senate's decision not to act on a nomination effectively is a rejection of that nomination."  Id.

According to the New Vista Nursing court, the durational component of the Recess Appointments Clause suggested that the Framers adopted the intersession definition of the phrase "the Recess of the Senate," because such definition retained the primacy of the Appointments Clause over the Recess Appointments Clause.  Id. at *23.  The court stated:

> Under the intersession-only definition, the president would make a recess appointment between sessions of the Senate, which ensures the continued operation of the government even though the Senate has not considered the president's selection.  Once the Senate begins its "next Session" by reconvening, the primary appointments process becomes available and—because the Constitution requires joint appointment authority—must be undertaken by the Senate and the president. However, to allow the operation of government to continue, the Senate has until the end of this session to consider the president's selection and confirm or deny it.  And if the body does not act or denies that appointment, then the recess appointment ends because the constitutional requirement of joint agreement has not been reached.  Through this process, the Appointments Clause retains its primacy as the preferred constitutional method of appointing officers, while the Recess Appointments Clause retains its auxiliary role that allows the president to fill positions when the ordinary process is unavailable.
>
> Under an intrasession definition, the Clause would no longer have an auxiliary role.  The president would make the recess appointment during a break within a Senate session.  But the Senate's reconvening and first subsequent adjournment—whether that be for a long intrasession break or for the intersession break— would have no immediate effect on the recess appointment because the appointment lasts until the "next Session," as demarked by adjournments sine die.

> The appointment would not expire until the Senate reconvened, adjourned sine die, reconvened, and then adjourned <u>sine die</u> a second time. Thus, the appointment would continue even though the opportunity to undergo the ordinary, preferred process had come and gone. This shows that when the intrasession definition of recess is combined with the durational provision, a fundamentally different relationship between the clauses is created: the intrasession definition makes the Recess Appointments Clause an additional rather than auxiliary method of appointing officers.

<u>Id.</u> at *23.

The court in <u>New Vista Nursing</u> next observed that the intersession definition of the phrase "the Recess of the Senate" was supported by the language of the original Senate Vacancies Clause, which used "'the next Meeting'" as its durational component. <u>Id.</u> (quoting U.S. Const. art. I, § 3, cl.2, <u>superseded by</u> <u>id.</u> Amend. XVII). According to the court, the durational component of the Recess Appointments Clause

> could have been phrased in a manner that would have allowed the Senate and president only one opportunity to undergo the ordinary process if recess instead included intrasession breaks. By setting the duration to the "'next Meeting,'" it becomes irrelevant what type of break the legislature took because once it convenes, the appointment expires and the legislature must act. That the Clause uses "next Session" rather than "next Meeting" thus shows that recess contemplates a particular type of break. And, in light of the competing operations of the definitions, that type is the intersession break.

<u>Id.</u> (footnote omitted).

The court in <u>New Vista Nursing</u> next rejected the Board's argument that the durational component of the Recess

Appointments Clause is consistent with the intrasession definition of the phrase "the Recess of the Senate." The Board argued that "if recess appointees' tenures did not extend until the end of the next session, then the Senate would lack an opportunity to consider a recess appointee when an intrasession break coincides with the end of a session." Id. at *24. The court rejected this argument, first, because the problem arises only if the intrasession definition of recess is adopted. Id. It does not arise under the intersession definition because, under that definition, the Senate can only weigh in one time, when it reconvenes for its next session. Id. Second, the court indicated the Board's reading of the durational component was not the most natural reading of the phrase "next Session"; otherwise, the phrase would be intended to address an unusual situation–where an intrasession break coincides with the end of a session. Id. The court noted that an intrasession break extended until the end of one of the Senate's 296 completed sessions at most only three times. Id. "The complete absence of the problem described by the Board in the last 225 years" implied that the durational component of the Recess Appointments Clause "was most likely written simply to reinforce the auxiliary nature of the Recess Appointment[s] Clause by limiting recess appointees' terms to last only as long as necessary to

afford the Senate one opportunity to undergo the ordinary process." Id.

The New Vista Nursing court then observed that its construction of the phrase "the Recess Appointments Clause" was supported by early historical practice, relying on much of the authority relied upon by the court in Noel Canning. Id. at *25. The court observed that, from ratification until 1921, there was a general consensus that recess appointments could be made only during intersession breaks. Id. This general understanding supported the intersession definition. Id. at **26-27. In relying on this early historical practice, the court rejected the notion that recent Presidential practices could alter the structural framework of the Constitution, especially the presumption that actions by the President are constitutional. Id. at *27. The court expressed doubt that such a presumption applies in separation-of-powers cases. Id. The court also observed that recent Presidential practice was inconsistent with the structure of the Constitution because the Constitution provides no measure of a "'long' duration and limits the duration of recess appointees' terms in a manner that indicates an intersession-only definition." Id. at *28.

Finally, the court in New Vista Nursing identified some additional considerations supporting its holding. The court noted that the unavailable-for-business definition was vague,

making the standard "difficult for the Senate and the president to predictably apply." Id. The court next noted that the intrasession definition that limits the term "recess" to long breaks is not "judicially defensible because whatever duration is selected as long [enough] would be based on something other than the Constitution." Id. at *29 (citation and internal quotation marks omitted). The court noted that the intrasession definition was "fraught with ambiguity," because if an "intrasession break of over ten days constitutes a recess, it is unclear at which point the adjournment evolves into a recess." Id. The court candidly noted that all of the definitions of the phrase "the Recess of the Senate" provided an opportunity for abuse. Id. However, such potential for abuse simply was the product of the separation-of-powers framework. Id. at *30. The solution to such abuse was not to tinker with the definition of "recess," but rather to allow the political process to play out, with each branch exercising their allocated powers. Id.

Because Becker was invalidly recess appointed to the Board during the March 2010 intrasession break, the court in New Vista Nursing concluded that the Board did not have the authority to issue its unfair labor practices decision in that case. Id. In so holding, the court declined to address the meaning of the word "happen" in the Recess Appointments Clause. Id.

D

All parties agree that the President may exercise his recess appointment power only "during the Recess of the Senate." There are three plausible definitions of the term "the Recess" as used in the Recess Appointments Clause.  Id. at *13.[19]  First is the definition adopted by the Noel Canning and New Vista Nursing courts: the term "the Recess" refers to intersession breaks of the Senate, that is, the period of time between an adjournment sine die and the start of the Senate's next session.  See id. ("We hold that 'the Recess of the Senate' means only intersession breaks."); Noel Canning, 705 F.3d at 499 (observing that the term "the Recess" means "the period between sessions of the Senate when the Senate is by definition not in session and therefore unavailable").  Second is the definition adopted by the court in Evans: the term "the Recess" includes intersession breaks as well as intrasession breaks.  387 F.3d at 1224.  As noted above, an intrasession break is the period of time between a non-sine die adjournment and the time the Senate reconvenes. Although the court in Evans did not create any temporal boundaries, a twelve-day break was at issue there, presumably the court in that case would agree with Attorney General

_____

[19] The Board does not argue that the President may exercise his recess appointment power anytime the Senate takes a break, and we note that such a definition of the term "the Recess" has never been embraced by the Executive or Legislative Branches, or the courts.  This anytime definition, though possible, simply is not plausible.

Daugherty's 1921 observation that a break for five or ten days does not fall within the definition of the term "the Recess." 33 Op. Att'y Gen. at 25.  Although the Board agrees with the definition of the term "the Recess" as developed in Evans and Attorney General Daugherty's opinion, it offers another definition, which gives us a third option.  The Board posits that the term "the Recess" refers to a period when the Senate is not open for business and, thus, unable to provide advice and consent on the President's nominations.  Under this unavailable-for-business definition, when the Senate holds pro forma sessions, the President may exercise his recess appointment power because the Senate is neither doing business nor available to provide its advice and consent.

As noted above, Enterprise and Huntington urge us to follow the first definition of the term "the Recess" set forth above, that is, the definition adopted by the Noel Canning and New Vista Nursing courts.  The Board urges us to adopt one of the two remaining definitions.  For the reasons stated below, we agree with the Noel Canning and New Vista Nursing courts that the term "the Recess," as used in the Recess Appointments Clause, refers to the legislative break that the Senate takes between its "Session[s]."  In other words, the term "the Recess" means the intersession period of time between an adjournment sine die and the start of the Senate's next session.

As noted above, the Recess Appointments Clause states that the President "shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session."  U.S. Const. art. II, § 2, cl.3.  From the text itself, the meaning of the term "the Recess" is not evident.  As noted by the New Vista Nursing court, Founding-era dictionaries are inconclusive on the meaning of the word "recess," with some definitions favoring an intersession definition and others favoring an intrasession or unavailable-for-business definition. 2013 WL 2099742, at *13 (noting that Samuel Johnson's 1785 dictionary defined "recess" to mean "retirement; retreat; withdrawing; secession" as well as "departure" and "removal to distance") (citation, alterations, and internal quotation marks omitted).  The clarity of the term "recess" is only marginally improved with the inclusion of the definite article "the."  On the one hand, the definite article "the" arguably points to a specific type of recess (an intersession break), on the other hand, "the" points to anytime the Senate is in recess (an intrasession break).  Id. at *17.  While we may not agree with the level of significance placed upon "the" by the court in Noel Canning, we agree that the use of the definite article suggests some "specificity."  Noel Canning, 705 F.3d at 500.  This is especially true since the Recess Appointments Clause does not

refer to "a recess," nor does it refer to the plural form "recesses."[20] The use of the definite article over the indefinite and plural forms provides some instructive evidence that "the Recess" refers to a legislative break between two "[s]ession[s]."

Even though the textual evidence is inconclusive, compelling reasons exist for adopting the intersession definition over the other two available definitions. First, the Constitution uses the more inclusive term "adjourn" or "Adjournment" to refer to those parliamentary breaks that could occur either after or during a session of Congress. See, e.g., U.S. Const. art. I, § 5, cl.1 (less than a majority of each House "may adjourn from day to day"); id. art. I, § 7, cl.2 (a bill not signed by the President shall not become law if "the Congress by their Adjournment prevent its Return"). Most instructive, the Adjournments Clause specifically provides that "during the Session of Congress" neither House may "adjourn for more than three days" without the "Consent of the other." Id. art. I, § 5, cl.4. By contrast, the term "the Recess" appears only once in the Constitution in relation to congressional breaks--in the Recess Appointments Clause, where it refers to a

_____

[20] Interestingly, the Framers did use the plural form "vacancies" in the Recess Appointments Clause.

particular sort of adjournment, the break between sessions of the Senate.

The Board responds by emphasizing that when the word "Adjournment" appears in the Constitution, it refers to both intersession and intrasession legislative breaks. This certainly is true. See The Pocket Veto Case, 279 U.S. at 680 (noting that the word "Adjournment" is used in the Constitution to refer not only to the final adjournment at the end of a Congress, but also to adjournments "from day to day"). However, the Board's arrow misses the target. Each time the term "adjourn" or "Adjournment" appears in the Constitution, it refers to an intrasession cessation of business, even when it may also encompass intersession breaks. Thus, the Framers consistently used the term "adjournment," rather than the term "the Recess," when it wanted to refer to a legislative break that could occur either during or between sessions of Congress. Cf. Noel Canning, 705 F.3d at 500 ("Not only did the Framers use a different word, but none of the 'adjournment' usages is preceded by the definite article. All this points to the inescapable conclusion that the Framers intended something specific by the term 'the Recess,' and that it was something different than a generic break in proceedings."). As noted by the court in New Vista Nursing, "if the framers had intended for the president to be able to appoint officers during intrasession

- 94 -

breaks, then the Recess Appointments Clause could have been worded differently, allowing recess appointments 'during the Adjournment of the Senate.'"  2013 WL 2099742, at *20.

Second, our interpretation of the term "the Recess" is supported by the Framers' understanding of the term.  In The Federalist No. 67, Hamilton explained that the recess appointment power supplemented the "ordinary power of appointment."  The Federalist No. 67, at 350.  This ordinary power, under the Appointments Clause, was to be exercised "jointly" by the President and Senate.  Id.  The supplemental authority only was to be exercised when "it might be necessary for the public service" to fill without delay certain vacancies that "might happen in [the Senate's] recess."  Id.  The Recess Appointments Clause was added because the joint power could only be "exercised during the session of the Senate."  Id.  Thus, by necessary implication, under Hamilton's view, recess appointments would be necessary, and thus permissible, only outside the session of the Senate.

The Framers' understanding of the Recess Appointments Clause is underscored by the appointment of duties inspectors by the First Congress, which contained twenty members who had been delegates to the Philadelphia Convention, see Bowsher v. Synar, 478 U.S. 714, 724 n.3 (1986).  The Act of March 3, 1791, ch. 15, 1 Stat. 199, authorizing the appointment of duties inspectors,

- 95 -

provided "[t]hat if the appointment of the inspectors of surveys . . . shall not be made during the present session of Congress, the President may, and he is hereby empowered to make such appointments during the recess of the Senate, by granting commissions which shall expire at the end of their next session."  Id. § 4, 1 Stat. at 200; see also Act of Sept. 22, 1789, Ch. 17, § 4, 1 Stat. at 71 (authorizing payment to Senate clerk of "two dollars per day during the session, with the like compensation to such clerk while he shall be necessarily employed in the recess").

The Framers' understanding is further underscored by the valid reasons supporting the distinction between intersession and intrasession breaks.  As noted above, at the time of the Constitution's ratification, breaks between sessions of Congress typically were six to nine months.  During such periods, it was unrealistic to think the Senate could perform its advice and consent function.  By contrast, there is no evidence that the Framers thought it was necessary to empower the President to make unilateral appointments while the Senate was adjourned within its session for short periods.  The Framers would not have contemplated any need to set aside "the ordinary power of appointments," The Federalist No. 67, at 350, during short breaks, let alone lunch, evening, or weekend breaks.

Third, the historical record supports the intersession definition of the term "the Recess." From 1789 until 1921, Presidents frequently made recess appointments between sessions of Congress. Notably, however, Executive practice was dramatically different during the thousands of instances when the Senate ceased or suspended business during its sessions over the course of those 132 years. Admittedly, most of those adjournments were for periods of fewer than three days, including almost every evening and weekend; but on at least sixty occasions the Senate also adjourned for more than three days. See U.S. Gov't Printing Office, 2003-2004 Official Congressional Directory: 108th Cong. 512-17 (2004). Taken to its logical conclusion, in the Board's view, each of these intrasession breaks was "the Recess" for purposes of the Recess Appointments Clause, during which the President could have made unilateral appointments. However, with only a single known possible exception (President Andrew Johnson), Presidents did not make recess appointments during these breaks. Edward A. Hartnett, Recess Appointments of Article III Judges: Three Constitutional Questions, 26 Cardozo L. Rev. 377, 408–09 (2005).

In 1901, the Executive Branch first considered the constitutionality of intrasession recess appointments. At that time, Attorney General Philander Knox opined "that the President is not authorized to appoint an appraiser at the port of New

York during the current [intrasession] adjournment of the Senate." 23 Op. Att'y Gen. 599, 604 (1901). Attorney General Knox explained that, in contrast to the Constitution's use of the broader term "adjourn[ment]," the term "the Recess" refers to "the period after the final adjournment of Congress for the session, and before the next session begins." Id. at 601. An "intermediate temporary adjournment" during the session, "although it may be a recess in the general and ordinary use of that term," is not "the recess during which the President has power to fill vacancies by granting commissions which shall expire at the end of the next session." Id.

As noted earlier, Attorney General Daugherty's opinion in 1921 changed the Executive Branch's understanding of the Recess Appointments Clause in favor of a functional approach, asking, in a practical sense, whether the Senate was in session so that its advice and consent could be obtained. 33 Op. Att'y Gen. at 21-22. He concluded that an intrasession adjournment could be deemed "the Recess" for purposes of the Recess Appointments Clause only when the Senate is "absent so that it can not receive communications from the President or participate as a body in making appointments." Id. at 25. Notably, Attorney General Daugherty rejected the argument that the President may make a recess appointment during any pause in Senate business. "[L]ooking at the matter from a practical standpoint," he

- 98 -

reasoned that "no one . . . would for a moment contend that the Senate is not in session when an adjournment [of two or three days] is taken," and added that even an adjournment "for 5 or even 10 days" could not satisfy his "practical" test.  Id.

As noted by the court in Noel Canning, the infrequency of intrasession recess appointments in the historical record and the relative disdain harbored toward such appointments in at least the first 132 years of our Nation suggests an "absence of [the] power" to make such appointments.  705 F.3d at 502 (citation and internal quotation marks omitted).  The marked increase in the number of recess appointments since the Reagan Administration may be attributed to political polarization being at an all-time high, rather than fidelity to the plain language and structure of the Recess Appointments Clause.  Wolf, 81 Fordham L. Rev. at 2078.

Fourth, we are troubled by the intrasession and unavailable-for-business definitions of the term "the Recess" because they thwart the advice and consent function engrained in the Appointments Clause.  Clearly, an expansive reading of the Recess Appointments Clause gives the President the ability to appoint controversial individuals to high government posts by preventing the Senate from performing its constitutional advice and consent function.  Obviously, such use of the Recess

Appointments Clause is at odds with the original purposes of both the Appointments and Recess Appointments Clauses.

The Board urges us to recognize an expansive reading of the Recess Appointments Clause as a way to ensure that the President can adhere to the Take Care Clause. The growing animosity between the Executive and Legislative Branches over Presidential nominees is an obvious concern, and such animosity explains the Board's reliance on Presidential discretion to determine when the Senate is in recess. See Lawfulness of Recess Appointments, 36 Mem. Op. O.L.C. at 23 ("[T]he President therefore has discretion to conclude that the Senate is unavailable to perform its advise-and-consent function and to exercise his power to make recess appointments."). But, ultimately, as noted by the Noel Canning court, it is incumbent on the judiciary to state what the law is, notwithstanding any presumption that arises under the Take Care Clause. 705 F.3d at 506 (quoting Marbury, 5 U.S. (1 Cranch) at 177). We simply cannot rely on political gridlock to embrace the Board's interpretation of the term "the Recess." Id. at 504 ("Allowing the President to define the scope of his own appointments power would eviscerate the Constitution's separation of powers.").

Fifth, the intrasession definition offers vague and the unavailable-for-business definition offers no durational guideposts. Under these definitions of the term "the Recess,"

- 100 -

the President simply is left to determine whether the Senate is in recess, with little or no guidance and/or judicial oversight. Yet, the constitutional structure of the Appointments and Recess Appointments Clauses demands more to ensure that the separation of the Executive and Legislative Branches is maintained. Drawing the line between intersession and intrasession breaks, in our view, strikes the appropriate balance.

To be sure, the durational component of the Recess Appointments Clause ("End of [the Senate's] next Session," U.S. Const. art. II, § 2, cl.3), only makes sense under the intersession definition of the term "the Recess." Under the intrasession and the unavailable-for-business definitions, a Presidential appointment does not proceed through the ordinary and preferred confirmation process because the Senate does not necessarily have to take up the appointment in the next session. As noted by the court in New Vista Nursing, the appointment would not expire until the Senate reconvened, adjourned sine die, reconvened, and then adjourned sine die a second time. 2013 WL 2099742, at *23. This makes the Recess Appointments Clause an alternative rather than an auxiliary method of appointment. Id.

Along a similar vein, because a recess appointee's commission lasts until the end of the Senate's "next [s]ession," there is no reason to think that the Framers would have designed

- 101 -

a scheme in which intrasession appointments could last longer than intersession appointments, i.e., to last throughout the remainder of the session, one additional intersession break, and the entire subsequent session, a period that could last almost two years. Thus, the relevant question is not, as the Evans court intimated, how long an intersession or intrasession recess may last, 387 F.3d at 1226, but rather how long such appointees may serve.[21]

Sixth, the intrasession and unavailable-for-business definitions of the term "the Recess" essentially prevent the Senate from establishing its own rules concerning the conduct of its proceedings. See U.S. Const. art. I, § 5, cl.2 ("Each House may determine the Rules of its Proceedings."). It is the Senate, not the President, who has the privilege of determining the manner in which the Senate meets during a Congressional session. In this case, the Senate decided to meet in pro forma sessions during a five-week period. During such sessions, the Senate is called to order. On December 23, 2011, during a pro

---

[21] The language of the original Senate Vacancies Clause, which used the phrase "'the next Meeting'" as its durational component, U.S. Const. art. I, § 3, cl.2, superseded by id. Amend. XVII, also supports the intersession definition of the term "the Recess" because the Recess Appointments Clause's use of the term "the Recess" instead of the phrase "the next Meeting" demonstrates that the Framers had a particular type of break in mind when it created the Recess Appointments Clause, instead of any type of break in Senate business, which essentially is what the intrasession definition allows.

forma session, the Senate passed payroll tax extension legislation, and that same day the President signed into law the payroll tax extension. This coordination of the Legislative and Executive Branches during pro forma sessions suggests that the Senate can perform its advice and consent function during such sessions.[22]

For the reasons set forth above, we agree with the Noel Canning and New Vista Nursing courts that the term "the Recess," as used in the Recess Appointments Clause, refers to the legislative break that the Senate takes between its "Session[s]." That is to say "the Recess" occurs during an intersession break--the period of time between an adjournment sine die and the start of the Senate's next session. Such an interpretation adheres to the plain language of the Appointments and Recess Appointments Clauses, and is consistent with the structure of the Constitution, the history behind the enactment of these clauses, and the recess appointment practice of at least the first 132 years of our Nation.

E

---

[22] We note that this case is not, as the Board would have us believe, about the propriety of legislative pro forma sessions. While the use of such sessions arguably can have an impact on the President's ability to make recess appointments, the practice does not alter our conceptual understanding of the Recess Appointments Clause, especially since the Senate is more than capable of conducting business during this time, as evidenced by the passage of the payroll tax extension.

In his spirited dissent, our good colleague embraces the unavailable-for-business definition of the term "the Recess," opining that the Senate is in "'the Recess' when it is not available to provide advice and consent on nominations." Post at 143. As the dissent sees it, the Senate is in "the Recess" if it "is not engaged in its regular course of business, is unavailable to receive messages from the President, or cannot meet to consider a nomination for a position." Post at 143.

The unavailable-for-business definition embraced by the dissent is a contemporary definition of the term "the Recess." Such definition, as the dissent recognizes, sets no minimum length for an intrasession break to be considered "the Recess." Post at 149. According to the dissent, the absence of such a minimum is not "a flaw, but rather a part of the[] grand design in drafting a compact" that would remain relevant for future generations. Post at 153. Untethering the recess appointment power from a durational guidepost, says our dissenting colleague, "operates to exclude the altogether silly scenario of the President making recess appointments during the Senate's breaks for meals or weekends, while including the types of weeks-long intrasession recesses that could stall the functioning of government if an important post is left vacant." Post at 153.

This contemporary definition of the term "the Recess" has no historical support. As noted earlier, up until 1921, that the President could only exercise his recess appointment power during an intersession break was settled. Attorney General Daugherty's 1921 opinion introduced a functional approach, yet even his definition recognized that a five or ten-day intrasession break would not suffice. 33 Op. Att'y Gen. at 25 ("Nor do I think an adjournment for 5 or even 10 days can be said to constitute the recess intended by the Constitution."). Moreover, the Office of Legal Counsel's 2012 memorandum opinion recognizes some durational minimum in reaching the conclusion that "the President's authority to make recess appointments extends to an intrasession recess of twenty days." Lawfulness of Recess Appointments, 36 Mem. Op. O.L.C. at 9. However, under the unavailable-for-business definition espoused by the dissent, a break as little as a couple of work days would suffice if the Senate could not meet to consider a nomination. No historical support exists for this proposition. The utter lack of historical support begs the question: How could all three branches of the federal government have been so wrong for so long? But the lack of historical support is just the beginning of the unavailable-for-business definition's shortcomings, and we have identified some of them in the previous section of this opinion. A closer analysis of the dissent reveals why the

unavailable-for-business definition simply is not a viable option.

The dissent begins where it should--with the language of the Recess Appointments Clause.  Upon examining such language, the dissent concludes the term "the Recess" is ambiguous.  To reach this conclusion, the dissent starts with the unremarkable proposition that the use of the definite article "the" in the term "the Recess" is inconclusive on the meaning of the term. From there, the dissent stresses that, if the term "the Recess" in the Recess Appointments Clause refers only to intersession breaks, the use of the term "the Recess" in the original Senate Vacancies Clause, U.S. Const. art. I, § 3, cl. 2, superseded by id. Amend. XVII, should mean the same thing.  The dissent posits that the term "the Recess" in the Senate Vacancies Clause cannot mean a singular recess (i.e., an intersession break) because "the clause is used to refer collectively to the various recesses of the several state legislatures."  Post at 137.  It follows, then, according to the dissent, that the term "the Recess" in the Recess Appointments Clause points to both intrasession and intersession recesses.  However, comparing the term "the Recess" in the Recess Appointments Clause to the term "the Recess" in the Senate Vacancies Clause is like comparing apples to oranges.  Critically, the Recess Appointments Clause and the Senate Vacancies Clause have different durational

components, "the next [s]ession" in the case of the Recess Appointments Clause, and "the next [m]eeting" in the case of the Senate Vacancies Clause. Because the durational component in the Senate Vacancies Clause is tied to "the next [m]eeting," the type of break the state legislature takes before it reconvenes is irrelevant because the recess appointment expires upon reconvention. Equally critical, the Senate Vacancies Clause does not involve the relationship between the Executive and Legislative Branches of the federal government, nor does it involve the relationship between the Appointments Clause and the Recess Appointments Clause. Thus, the term "the Recess" must be construed in two very different contexts. The Supreme Court has recognized that some words in the Constitution have different meanings "according to the connection in which [they are] employed" and "the character of the function" in which the word is found. Atlantic Cleaners & Dryers v. United States, 286 U.S. 427, 433–34 (1932). Such is the case here. The term "the Recess" in the Senate Vacancies Clause must apply in a variety of situations to account for the various parliamentary procedures used by state legislatures. The same cannot be said about the term "the Recess" as used in the Recess Appointments Clause. Moreover, the Recess Appointments Clause's use of "the next [s]ession" shows that the Recess Appointments Clause "contemplates a particular kind of break[, a]nd, in light of the

competing operations of the definitions, that type is the intersession break." New Vista Nursing, 2013 WL 2099742, at *23.

The dissent finds further ambiguity in the term "the Recess" because the intersession definition of the term "the Recess" requires the insertion of a modifier, namely "intersession," before the term "the Recess." However, if the intersession definition requires the insertion of a modifier, so does the unavailable-for-business definition. To make that definition work, one has to read "the Recess" to mean "the Recess in which the Senate cannot provide advice and consent." Thus, the dissent's modifier argument misses the mark. Both the majority and the dissent are attempting to divine the meaning of the term "the Recess" by examining the text of the Constitution and historical usages and practices. We believe, for the reasons expressed above, such evidence decidedly points to the intersession definition, while the dissent sees the evidence pointing in a different direction. Put another way, after examining such evidence, the intersession definition does not use "intersession" as a modifier because "the Recess" "means only intersession breaks." New Vista Nursing, 2013 WL 2099742, at *25 n.30.

Next, continuing its ambiguity analysis, the dissent downplays the significance that the Constitution uses the terms

"adjourn" and "adjournment" in a broader sense than the term "the Recess," describing "the distinction between adjournments and 'the Recess'" as a "convenient correlation" with "no basis in the text of the Constitution." Post at 139. However, the fact remains that the terms "adjourn" and "adjournment" necessarily apply to both intersession and intrasession recesses, while the term "the Recess" does not. This certainly indicates that the Framers believed "the Recess" applied in a narrower context.

Concluding its ambiguity analysis, the dissent rejects as irrelevant the fact that an intrasession appointee's term could last twice as long as an intersession appointee. According to the dissent, "nothing in the Recess Appointments Clause," or anywhere else in the Constitution for that matter, "requires that all recess appointments be of the same length, and such an interpretation does not further" the purpose of the clause. Post at 140. But the dissent's view ignores the structure of the Recess Appointments Clause. It provides that a recess appointment expires at the end of the Senate's "next [s]ession." Thus, there is a dichotomy between "the Recess" and the "next [s]ession" such that the Senate is either in session or it is in recess. Recess appointments are allowed during "the Recess" preceding the "next [s]ession" and that "next [s]ession" then caps the length of any such appointments--one Senate session.

This ensures that the Senate always has one full session to consider confirmation. Once the Senate has that opportunity to consider confirmation, the need for an emergency appointment is gone. As Justice Story explained way back in 1833, "the president should be authorized to make temporary appointments during the recess, which should expire, when the senate should have had an opportunity to act on the subject." 3 Joseph L. Story, Commentaries on the Constitution of the United States § 1551 (1833); see also New Vista Nursing, 2013 WL 2099742, at *22 ("The Clause's function is . . . fulfilled once an opportunity for the Senate to act has come and gone.").

More telling, the dissent offers no explanation for why the Constitution would empower the President to double the length of recess appointments through strategic timing. We can find none. But the fact remains, the unavailable-for-business definition creates the inexplicable anomaly that intrasession recess appointees may serve twice as long as their intersession counterparts. It strains credulity that the Framers intended such a result. Rather, they intended all recess appointments to be made during the intersession break, which would result in all such appointments lasting one Senate session.

Having found "a strictly textual interpretation" of the Recess Appointments Clause "inconclusive," the dissent turns its attention to the purpose underlying the clause. The dissent

concludes that the sole purpose of the clause is to "ensure the proper functioning of government," Post at 144, and that the unavailable-for-business definition fits comfortably within that purpose. Telling from the dissent's discussion is its reluctance to give one of the core functions of the clause its proper place. One of the purposes behind the Recess Appointments Clause is "to preserve the Senate's advice-and-consent power by limiting the president's unilateral appointment power." New Vista Nursing, 2013 WL 2099742, at *18. Yet, the dissent downplays the Senate's role almost to the point of a casual bystander, noting that it is not permitted to "weigh the executive's policy choice." Post at 142. What the dissent is doing, really by necessity, is placing all of the face cards in the hands of the President. However, the Framers had something completely different in mind when it created the Appointments and Recess Appointments Clauses. At the time of ratification, the Framers were skeptical with the notion of unilateral executive appointments power. As noted by the Supreme Court in Freytag, the "power of appointments to offices was deemed the most insidious and powerful weapon of eighteenth century despotism." 501 U.S. at 883 (citation and internal quotation marks omitted); see also Edmond v. United States, 520 U.S. 651, 659 (1997) (noting that the advice and consent feature in the Constitution "serves both to curb Executive abuses of the

- 111 -

appointment power, . . . and to promote a judicious choice of persons for filling the offices of the union") (citations, internal quotation marks, and alterations omitted).  As a consequence of this concern, the Framers sought to "ensure that those who wielded [appointments powers] were accountable to political force and the will of the people" by limiting the power of the Executive and Legislative Branches.  Freytag, 501 U.S. at 884.  This was accomplished through a division of power between these two branches.  Id.  And to ignore this division of power, as the dissent essentially does, destroys one of the central pillars undergirding the Appointments and Recess Appointments Clauses.

Moving from its discussion of the purpose of the Recess Appointments Clause, the dissent engages in an extended discussion concerning how the unavailable-for-business definition "fits with historical practice."  Post at 144  The dissent begins its discussion by downplaying the significance of the fact that it was universally recognized for the first 132 years of our Nation that "the Recess" meant an intersession recess.  See post at 145 ("In my view, a functional interpretation of the Recess Appointments Clause properly counsels against a blind adherence to the precise procedural conditions in which earlier executives exercised the power.").  Yet historical practice is extremely important to the Recess

Appointments Clause analysis.  See, e.g., District of Columbia v. Heller, 554 U.S. 570, 600-19 (2008) (examining historical practices and understandings concerning the Second Amendment's right to bear arms); Freytag, 501 U.S. at 883-84 (examining history to determine the scope of the Appointments Clause).

In any event, what the dissent ignores here is that, in the first 132 years of our Nation, there were numerous opportunities to make intrasession recess appointments, but none, with the lone possible exception of one by President Andrew Johnson, were made.  The Senate took three intrasession recesses in 1800, 1817, and 1828, and, beginning in 1863, the Senate started taking annual intrasession recesses of approximately two weeks from the end of December through the beginning of January. Michael A. Carrier, Note, When is the Senate in Recess for Purposes of the Recess Appointments Clause?, 92 Mich. L. Rev. 2204, 2211 (1994).  Despite this increase in intrasession breaks, and the corresponding increase in opportunities to make appointments during such breaks, Presidents continued to make recess appointments exclusively (with the possible President Andrew Johnson exception) during intersession breaks.  Id. Unlike our dissenting colleague who must view the Recess Appointments Clause in a contemporary, "practical light," post at 149, we find this historical understanding of the recess appointments procedure telling.

The dissent next turns its focus to a purported flaw in the intersession definition of the term "the Recess"--the lack of a durational minimum. The dissent notes that, like the unavailable-for-business definition, the intersession definition fixes no minimum length. See post at 149 ("Thus, if Congress takes a one-day break between sessions, the majority apparently would find no fault with the President making a recess appointment during that time, despite the fact that the Senate would have returned to business the next day and been available to provide its advice and consent on the nominee."). According to the dissent, the intersession definition is flawed because it allows for a recess appointment during a momentary intersession break. The dissent's argument here is a red-herring. All courts and commentators agree that the President may make recess appointments during intersession breaks, regardless of the break's length. So the lack of a durational minimum in the intersession definition simply is of no consequence. But the lack of such a minimum is understandable for another reason. The durational component of the Recess Appointments Clause entered the discussion only when the Executive Branch sought in 1921 to expand the settled understanding of the term "the Recess." Until that time, a durational minimum was not brought to the forefront because it was understood that the President's

recess appointment power could only be exercised during the intersession break, regardless of its length.

The dissent next argues that the intersession definition of the term "the Recess" is flawed because it assumes "the President might abuse his power to appoint officials." Post at 150. In this regard, the dissent likens the President's recess appointment power to his veto and pardoning powers, noting that there are no limits on the exercise of these latter powers; thus, we must "expect some modicum of good faith in the individual our fellow citizens elect to the most powerful office in the world." Post at 150-51. And the dissent adds that we give "short shrift" to the "presumption of constitutionality" accorded to Presidential actions. Post at 152. The dissent's argument once again misses its intended target. First off, we harbor doubt that a presumption of constitutionality applies in separation-of-powers cases. See New Vista Nursing, 2013 WL 2099742, at *27 ("Our role as the ultimate interpreter of the Constitution requires that we ensure its structural safeguards are preserved. . . . It is a role that cannot be shared with the other branches anymore than the president can share his veto power or Congress can share its power to override vetoes.") (citations and internal quotation marks omitted); see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 130 S. Ct. 3138, 3155 (2010) (noting that "the separation of powers does

not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment") (citation and internal quotation marks omitted); Clinton v. New York City, 524 U.S. 417, 428-48 (1998) (analyzing the constitutionality of the line-item veto without expressing the need to defer to the other branches' constitutional judgments); New York v. United States, 505 U.S. 144, 182 (1992) (noting that the "Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment"). But notwithstanding any presumption, comparing the President's veto and pardoning powers to his recess appointment power is just another apples to oranges comparison. These other powers were not "the most insidious and powerful weapon of eighteenth century despotism." Freytag, 501 U.S. at 883 (citation and internal quotation marks omitted). The power that can be wielded by a President who desires to make an end-run around Senate approval is obvious. The dissent says that Presidents will not act so unruly because the President will want to maintain favor with the Senate and with the public at large. But the recent historical record suggests otherwise. In the past two Presidential administrations, nearly all recess appointees themselves previously were nominated to their posts, usually by several months. See Henry B. Hogue & Maureen

Bearden, Cong. Research Service, R42329, Recess Appointments Made by President Barack Obama, at 7 (2012); Henry B. Hogue & Maureen Bearden, Cong. Research Service, RL33310, Recess Appointments Made by President George W. Bush, January 20, 2001-October 31, 2008, at 3-5 (2008). If anything, this recent evidence shows that recess appointments have become a means to sidestep the confirmation process.

The dissent next posits that the intersession definition of the term "the Recess" is flawed because it leaves the President powerless to act. According to the dissent, "the Senate is free to read out of the Constitution the President's recess appointment power by refusing to take intersession recesses, opting instead to take an extended intrasession break, returning just before the session ends, and then moving directly into the next session." Post at 153. The dissent here is overstating its case. For starters, under the unavailable-for-business definition, the President easily can get around Senate advice and consent by strategically making his recess appointments, as he did in this case. More importantly, the Senate already is in a position to substantially limit the President's appointments power by remaining in session. But remaining in session does not ensure that the Senate will act on the President's nominations. The upshot is that the Constitution envisions the potential for gridlock between the Executive and Legislative

Branches, with neither side having the upper hand in resolving such gridlock. Such gridlock simply is resolved through the political process.

The dissent next claims that the intersession definition of the term "the Recess" is flawed because it "actually gives the House of Representatives a de facto veto on Presidential recess appointments." Post at 155. According to the dissent, because the Adjournments Clause requires the House and Senate to agree on any adjournment lasting longer than three days, the Adjournments Clause enables the House of Representatives to prevent the Senate from adjourning sine die. This, the dissent says, inserts the House of Representatives into the appointments process even though the Constitution purposely excludes it from that process. Such is not the case. The Constitution allows the President to adjourn both houses of Congress if the two houses cannot agree on a date of adjournment. U.S. Const. art. II, § 3. This provision allows the President to prevent the House of Representatives from interfering in the appointments process if the House and Senate cannot agree on a date of adjournment.

The dissent "confess[es] to some surprise" concerning the basis for our rejection of the dissent's de facto veto argument. Post at 156. Because we reject the dissent's de facto veto argument on the basis that the President may adjourn Congress

- 118 -

when there is a disagreement between the houses of Congress concerning the date of adjournment, the dissent says such reasoning necessarily means that the President gets to decide when the Senate is in "the Recess." See post at 156 ("[I]t would allow the President to decide when the Senate is in "'the Recess,' thereby granting the President the precise unilateral power of appointment that the majority finds objectionable."). Not so. Either the House will agree to a date of adjournment sine die or it will not. In the latter case, the Senate has two choices, remain in session or ask the President to set a date of adjournment and a date of reconvention. Here, the Senate chose to remain in session by way of pro forma sessions, which meant that the Appointments Clause was the proper mechanism to make the Board appointments at issue. Moreover, Article II, § 3 does not give the President unilateral power concerning adjournments. There must be a disagreement concerning the date of adjournment which would give rise to one house of Congress seeking Presidential intervention. As far as we can tell, neither house of Congress has ever sought such intervention. But if the Senate felt the need to request Presidential intervention, it is an available option if the House and Senate cannot reach an agreement on the date of adjournment. And once Presidential intervention is sought, and the President sets a date of adjournment sine die and a date of reconvention, the President

- 119 -

may exercise his appointments power pursuant to the Recess Appointments Clause. Of course, that is not what happened here.[23]

Finally, the dissent suggests that the unavailable-for-business definition does not interfere with the Senate's ability to regulate its own rules. According to the dissent, "while the Senate may meet in pro forma sessions when its members see fit, the President may also choose to use his recess appointment power during such sessions if the Senate is practically unavailable to provide its advice and consent for nominees." Post at 157. The dissent here gives the President a dual light-saber. The President has the power to both unilaterally make recess appointments and unilaterally declare when the Senate is

---

[23] There is an important similarity between the President's adjournment power and his appointment power worth noting. In the adjournment setting, both houses of Congress work together on setting a date of adjournment. If they cannot agree and one house is determined to adjourn for more than three days, that house can seek Presidential intervention. Before the moment of Presidential intervention, each house is acting pursuant to its own chosen rules of procedure, and the President must respect such rules before acting; otherwise the President can exercise almost absolute power over when Congress can meet. The same Presidential respect is necessary to make the Appointments Clause and Recess Appointments Clause function properly. The Senate operates pursuant to its own rules and determines in what manner it will meet. If the Senate decides to meet in pro forma sessions, the President must respect such decision and make appointments pursuant to the Appointments Clause. If he chooses to ignore such Senate action, he can exercise almost absolute power over appointments. The intersession definition of the term "the Recess" preserves this necessary Presidential respect; the unavailable-for-business definition does not.

in recess. Such a view gives the President the very absolute power of appointment that the Framers sought to withhold. This dual light-saber has disastrous consequences. If the President dictates when the Senate is in recess, essentially he can make recess appointments any time he feels the Senate is unavailable to advise and consent. This results in the Recess Appointments Clause swallowing the Appointments Clause. Appointments under the Appointments Clause could become the exception rather than the rule. In this regard, the circumstances surrounding the appointments in this case are telling. Block and Griffin were nominated approximately three weeks before their recess appointments. The President nonetheless made these recess appointments even though the Senate was in a position to advise and consent. One of the central features of a pro forma session is that the Senate convenes. Neither the dissent nor the Board can distinguish pro forma sessions from ordinary sessions on the basis of the Senate's availability because during pro forma sessions the Senate convenes in a manner that allows it to consent to nominations if it wants to do so. This is evidenced by the Senate's passing of the payroll tax legislation. "Holding that the Senate is unavailable during these sessions requires a definition of availability that allows the counterintuitive situation in which the Senate is available to enact legislation while simultaneously unavailable to provide

its advice and consent." New Vista Nursing, 2013 WL 2099742, at *19 n.23.

The dissents says that the payroll tax legislation was an "extraordinary bill that was part of a broader legislative effort to avert a national financial catastrophe, and was passed by unanimous consent, thus not requiring the Senate to return to Washington." Post at 158. Yet, the dissent never explains why legislation passed pursuant to a unanimous-consent agreement is permissible, but a similar procedure would be inadequate to give advice and consent on a nominee.[24] This flaw in the dissent's reasoning explains why the Senate is responsible for establishing its own rules subject to the limitations outlined in the Constitution.[25] Reduced to its essence, then, the dissent is objecting not to the Senate's inability to conduct business,

---

[24] Of course, the payroll tax legislation is not the only piece of legislation to have been passed during a pro forma session. There have been many. See, e.g., Airport and Airway Extension Act of 2011, 157 Cong. Rec. S5297 (daily ed. Aug. 5, 2011) (passed by the Senate during its August 5, 2011 pro forma session).

[25] The constraints on the manner in which the Senate conducts its business are minor. It must meet once a year on January 3 (or another date Congress chooses), U.S. Const. amend. XX, § 2, and when called into special session by the President, id. art. II, § 3. And once convened, the Senate cannot adjourn for more than three days (or to another place) without the House's consent. Id. art. I, § 5, cl.4. As noted earlier, only if the House and Senate disagree does the President play a role in adjournments. Id. art. II, § 3.

but rather to the procedure chosen by the Senate to conduct its business. And the Senate has chosen to conduct business through unanimous-consent agreements rather than through actual roll-call votes.[26] But this is a judgment call made by the Senate. It simply is not the province of this court to dictate the manner in which the Senate chooses to conduct its business. Yet this is exactly what the dissent would do here--it is saying that the Senate was not in session even though it was fully capable of acting if it desired to do so.

We certainly respect the position taken by our good colleague in dissent. The dissent attempts to craft a solution to a very difficult problem that hopefully the Supreme Court will resolve in Noel Canning. At the end of the day, we have an honest disagreement with a colleague we hold in high esteem. But for the reasons stated above, we cannot embrace the unavailable-for-business definition.

F

In this case, the President's three January 4, 2012 appointments to the Board were not made during an intersession recess because Congress began a new session on January 3, 2012.

---

[26] The use of unanimous-consent agreements is commonplace. From the 101st to the 110th Congresses, "an average of 93 percent of approved measures did not receive roll call votes and in the 111th Congress through February 1, 2010, 94 percent of approved measures were approved without a roll call vote." 156 Cong. Rec. S7137-38 (daily ed. Sept. 15, 2010).

Consequently, "these appointments were invalid from their inception." Noel Canning, 705 F.3d at 507. Because the Board lacked a quorum of three members when it issued its 2012 unfair labor practices decisions in both the Enterprise and Huntington cases, its decisions must be vacated. New Process Steel, 130 S. Ct. at 2644–45.[27]

V

Unfortunately, in modern times, the question concerning the scope of the President's recess appointment power under the Recess Appointments Clause has become a political debate regarding the qualifications of the President's nominations, rather than a genuine, meaningful debate regarding the true meaning of the clause. Today, it is the Executive Branch, with a Democratic president in office, seeking to exercise expansive recess appointment power. Republicans are crying foul. See Brief of Senate Republican Leader Mitch McConnell and 44 Other Members of the United States Senate as Amici Curiae in Support of Certiorari in NLRB v. Noel Canning, 2013 WL 2352593, at **5-19 (May 28, 2013) (challenging, inter alia, President Obama's

---

[27] Because we agree with Enterprise and Huntington that "the Recess," as used in the Recess Appointments Clause, refers to the legislative break that the Senate takes between its "Session[s]," we need not decide whether the appointments at issue are also invalid because the vacancies did not "happen" during "the Recess."

- 124 -

three January 4, 2012 recess appointments to the Board); Senator Roger Wicker, Executive Overreach and Recess Appointments, 31 Miss. C. L. Rev. 319, 321-27 (2013) (same). In the case of Judge Pryor, it was a Republican president, President Bush, in office, seeking to exercise expansive recess appointment power, with the Democrats crying foul. See Brief of Amicus Curiae Senator Edward Kennedy in Support of Petitioner's Petition for Writ of Certiorari in Franklin v. United States, 2004 WL 2326801, at **6-19 (October 12, 2004) (challenging the recess appointment of Judge Pryor). Who knows what tomorrow will bring? Regardless, one thing must remain constant--the meaning of the Recess Appointments Clause, and it is the duty of this court to set forth that meaning irrespective of political fortunes. We have done so here.[28] We deny the Board's applications for enforcement of its orders.

ENFORCEMENT DENIED

---

[28] The Board does not suggest that we should decline to address the meaning of the term "the Recess" because it is a non-justiciable political question. See Baker v. Carr, 369 U.S. 186, 198, 217 (1962) (outlining requirements of non-justiciability). However, if the Board raised such an argument, we would reject it. See New Vista Nursing, 2013 WL 2099742, at **8-10 (rejecting non-justiciability argument); Evans, 387 F.3d at 1227 (same).

DUNCAN, Circuit Judge, concurring:

I concur in Parts I-III of the majority opinion. I also fully concur in Parts IV and V, because I agree that the most plausible reading of the Constitution's Recess Appointments Clause limits "the Recess" to the so-called "intersession break" between two legislative sessions. I write separately to briefly underscore what, in my view, compels the conclusion reached by the majority in this regard.

I begin by explicitly recognizing what should be evident from the spirited and principled debate between my two colleagues: this appeal presents a challenging issue with respect to which there is limited guidance. The Constitution does not define "the Recess," and we find no discussion of the Recess Appointments Clause at the Constitutional Convention in Philadelphia or the state ratifying conventions. Alexander Hamilton's brief essay in Federalist 67 addresses the Recess Appointments Clause only in passing, focusing instead on counteracting the misrepresentation made by opponents of ratification that the Constitution permitted the President to fill vacancies in the Senate. Historical practice in the decades following ratification of the Constitution is similarly sparse, and too easily subject to manipulation by "savvy lawyers," as the dissent rightly notes. Diss. Op. at 147. Nor is it obvious how the uptick in intrasession recess appointments

since 1981 ought to affect our analysis.  Compare Marsh v. Chambers, 463 U.S. 783, 792 (1983) (upholding the practice of beginning legislative sessions with a prayer because its long history of use had made it "part of the fabric of our society"), with INS v. Chadha, 462 U.S. 919, 944 (1983) (observing that the increased frequency of the Congressional veto in statutes "sharpened rather than blunted" the judicial inquiry).

But therein lies the flaw at the heart of the dissent's logic.  It faults the majority's textual arguments, but, significantly, proffers none in response.  Rather, the dissent falls back on the same purposive reading of legislative tea leaves for which it chides the majority, but without any textual underpinning.  It is certainly noteworthy that "the Recess" sits in grammatical tension with a reference to all inter-and intra-session breaks.  And although perhaps not decisive, the interplay of "recess" and "adjourn/adjournment" and the framers' use of "Session," see Maj. Op. at 91-95, at least tips the scale of the textual argument in favor of the majority's intersession-only reading of the Recess Appointments Clause when there is no counter-weight in the balance.

I am further troubled--and unpersuaded--by the dissent's skating past the constitutional text and "look[ing] to the purpose of the clause as our lodestar."  Diss. Op. at 148.  If, as the dissent contends, the text is ambiguous, surely

discerning the proper application of the Recess Appointments Clause's purpose is even more so. The clause's purpose is, as the dissent acknowledges, actually twofold: "to ensure a functioning government and maintain the separation of powers between the executive and legislative branches of that government." Id. at 131. The dissent reaches its conclusion only by elevating the goal of ensuring the functioning of the government when the Senate is (ostensibly) unavailable to provide its advice and consent, and ignoring that of maintaining the separation of powers by cabining the President's unilateral appointments power to limited circumstances. The dissent's failure to explain why it has emphasized one of the Recess Appointments Clause's purposes and largely ignored the other also gives one pause.

Finally, the majority offers a more judicially manageable interpretation of "the Recess" than that offered by the dissent. Although the dissent criticizes the majority's reading of the Recess Appointments Clause as "unworkable in practice," id. at 134, in my view, that description more aptly applies to the dissent's position. Limiting "the Recess" to intersession breaks creates clear parameters for the Legislative and Executive branches on when the Senate is in recess for purposes of the Recess Appointments Clause. Such clarity is of particular importance when, as here, the case implicates the

separation of powers doctrine.  See Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 239 (1995) (identifying the separation of powers doctrine as a structural safeguard which requires "establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict").

The dissent's proposed standard, by contrast, offers no guidance, meaningful or otherwise.  Its view that the Senate would be in "the Recess" when it "is not engaged in its regular course of business, is unavailable to receive messages from the President, or cannot meet to consider a nominee for a position," Diss. Op. at 143, raises more questions than it answers.  What constitutes the Senate's "regular course of business"?  What precludes the Senate from providing its advice and consent during a pro forma session?  How long must the Senate be unavailable to receive messages, and what (and who) determines its unavailability?  Would a senator filibustering a nominee mean the Senate "cannot meet to consider th[at] nominee for a position," and therefore give rise to the President's recess appointments power?  I fear that these and other questions, for which the dissent provides no answers, would be more, rather than less, problematic.

I therefore fully concur in the majority's reading of the Recess Appointments Clause.

DIAZ, Circuit Judge, concurring in part and dissenting in part:

When they convened in Philadelphia in May 1787 for the Constitutional Convention, the Framers understood that they were engaged in something more than a drafting exercise. Their effort was an inspired work following a debate for the ages about the role of government, its relationship to the people, and--as we consider today--the division of power among its coordinate branches. These consolidated appeals require us to interpret the Recess Appointments Clause of Article II of the Constitution, which received little attention or discussion at the Founding, and yet serves as a linchpin of the division of power between the President and the Senate.

I am pleased to join my colleagues' resolution of these cases as to the merits of the National Labor Relations Act issues, contained in parts I, II, and III of the majority opinion. But I part company with my friends on the constitutional questions before us.[1] In interpreting the Recess

---

[1] The Board contends that Enterprise Leasing Co. and Huntington Ingalls, Inc. (the "Employers") have waived certain constitutional arguments--namely, that "the Recess" refers to intersession recesses only and that "may happen" means "happen to arise"--by first raising them in their reply briefs. But we have discretion to consider an untimely constitutional challenge to an officer's appointment, see Freytag v. CIR, 501 U.S. 868, 878-79 (1991), and considering the significance of the constitutional questions presented by these appeals, such discretion is properly exercised here. We also remedied any
(Continued)

Appointments Clause, we must be mindful of the Framers' intent in drafting it: to ensure a functioning government and maintain the separation of powers between the executive and legislative branches of that government. With this purpose fixed firmly in mind, and for the reasons I explain below, I find no constitutional defect in President Barack Obama's intrasession recess appointments of National Labor Relations Board ("NLRB" or the "Board") Members Sharon Block, Terence Flynn, and Richard Griffin, Jr.

## I.

These appeals originate from the Senate's unanimous consent resolution to "adjourn and convene for pro forma sessions only, with no business conducted," between December 20, 2011 and January 23, 2012. 157 Cong. Rec. S 8783-03 (daily ed. Dec. 17, 2011). These pro forma sessions were necessary, at least in part, because the House of Representatives, relying on the Adjournments Clause of the Constitution,[2] refused to give consent for the Senate to take its normal extended intersession recess.

---

harm the Board would have suffered by granting both parties permission to address the arguments in supplemental briefs.

[2] The Adjournments Clause provides that "[n]either House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days." U.S. Const. art. I, § 5, cl. 4.

See NLRB v. New Vista Nursing and Rehabilitation, LLC, Nos. 11-3440, 12-1027, 12-1936, 2013 WL 2099742, at *32 n.6 (3d. Cir. May 16, 2013) (Greenaway, J., dissenting) (citing Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions, 36 Op. O.L.C. 1, 2-3 (2012)). As a result, the pro forma sessions created two intrasession recesses: one lasting from December 17, 2011, to January 2, 2012, and another lasting from January 3 (when a new session of Congress began) to January 23, 2012.

Each Tuesday and Friday during these periods, a single senator took to the floor to convene and adjourn each pro forma session, which typically lasted for no more than a minute. The Senate did not say a prayer or recite the Pledge of Allegiance during these sessions, see 158 Cong. Rec. S3-11 (daily eds. Jan. 6-20, 2012), nor did it receive messages from the President or the House, see 158 Cong. Rec. S37 (daily ed. Jan. 23, 2012). During one such session, the Senate agreed by unanimous consent to the payroll tax extension, see 157 Cong. Rec. S 8789 (daily ed. Dec. 23, 2011), which the President signed into law that same day.

On January 3, 2012, Board Member Craig Becker's recess appointment term ended, leaving the Board without a quorum. President Obama had nominated Sharon Block and Richard Griffin to the Board on December 14, 2011, but the Senate had not yet

- 132 -

voted on their nominations before recessing on December 17. On January 4, the President, apparently concluding that the Senate had entered "the Recess" despite its pro forma sessions, appointed Members Block, Griffin, and Flynn using his recess appointment power. See Press Release, The White House, President Obama Announces Recess Appointments to Key Administration Posts (Jan. 4, 2012), available at http://www.whitehouse.gov/the-press-office/2012/01/04/president-obama-announces-recess-appointments-key-administration-posts.

The President acted pursuant to the Recess Appointments Clause, which gives him the "Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting the Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3. The majority says that, as used in the clause, "the Recess" refers to the break between the end of one regular session of the Senate and the convening of the next (the so-called "intersession recess"). Because the Senate was not in an intersession recess when the President made his appointments, the majority holds that they are constitutionally invalid. As the Board notes, this view of the Recess Appointments Clause also deems invalid over 500 appointments by fourteen Presidents dating back to the 1860s. See NLRB Supp. Br. 17.

The majority's definition of "the Recess" presumes a textual clarity not found in the clause and, more importantly, upsets the Framers' carefully crafted allocation of power between the President and the Senate in the appointments process.  I would hold instead that "the Recess" "refers to both intra- and intersession recesses because the Senate can be unavailable to provide advice and consent during both."  New Vista, 2013 WL 2099742, at *30 (Greenaway, J., dissenting). Interpreting the clause as I propose, that is, with an eye to its original purpose, lends a pragmatic understanding of the scope of the authority it confers, while maintaining the delicate balance of power that the Framers intended.  Because the majority's reading of the clause is not supported by the language itself and is unworkable in practice, I respectfully dissent from parts IV and V of the opinion.


II.

The Appointments Clause of the Constitution provides that the President shall nominate, "and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States[.]"  U.S. Const. art. II, § 2, cl. 2.  Recognizing that it would be impractical for the Senate to remain perpetually in session to consider presidential

- 134 -

nominees, The Federalist No. 67, at 410 (Alexander Hamilton) (C. Rossiter ed., 1961), the Framers also gave the President the power to make recess appointments.

The majority has accurately summarized the law supporting the conflicting interpretations of the Recess Appointments Clause: the first, championed by the Employers and recently embraced by the Third and D.C. Circuits,[3] reads the clause so as to allow the President to make recess appointments only during an intersession recess, while the second, favored by the Board and by the Second, Ninth, and Eleventh Circuits,[4] as well as by Judge Greenaway in dissent in New Vista, maintains that the President's power to appoint extends to recesses generally, no matter when they occur.[5]  I find the latter reading--also termed the "functional approach"[6]--to be more persuasive.

---

[3] See New Vista, 2013 WL 2099742; Noel Canning v. NLRB, 705 F.3d 490 (D.C. Cir.), cert. granted, __ U.S. ____ (2013).

[4] See Evans v. Stephens, 387 F.3d 1220 (11th Cir. 2004) (en banc); United States v. Woodley, 751 F.2d 1008 (9th Cir. 1985) (en banc); United States v. Allocco, 305 F.2d 704 (2d Cir. 1962).

[5] The majority says that the Board espouses a third interpretation of the clause, i.e., that a break need not meet a minimum time threshold in order to be considered "the Recess." I do not think the Board goes so far.  To the contrary, the Board has specifically distinguished the instant situation from "an ordinary, long-weekend recess," NLRB Br. 40, and aligned itself with the understanding that the clause generally excludes "very short breaks" of fewer than three days, NLRB Supp. Br. 15-16.
(Continued)

A.

The first rule of constitutional interpretation is, of course, to apply the plain meaning of the text. McPherson v. Blacker, 146 U.S. 1 (1892); see also District of Columbia v. Heller, 554 U.S. 570, 576 (2008) ("In interpreting [the] text, we are guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." (internal quotations omitted)).

The problem with a textualist view of the Recess Appointments Clause is that the language, while sparse, is anything but clear. See New Vista, 2013 WL 2099742, at *13 ("The word 'recess' lacks a natural meaning that clearly identifies whether it includes only intersession breaks or also includes intrasession breaks, whether they be of a certain duration or a period of unavailability."). Most Americans would understand a "recess" to be a break from something--in this case a break from Senate proceedings. The question, then, becomes whether the Framers' use of the definite article (i.e., "the")

---

[6] See Noel Canning, 705 F.3d at 504 (calling the Board's interpretation, as set out by Attorney General Daughtery in 1921, the "functional approach"); New Vista, 2013 WL 2099742, at *12 (same).

as a modifier was intended to denominate a particular type of break.

I think it a stretch to say that the plain language of the clause shows that the Framers intended to limit the President's recess appointment power to the singular period between two congressional sessions.  If that were so, then it would stand to reason that the other use of "the Recess" in the Constitution-- in Article I, Section 3, Clause 2,[7] which provides for the temporary appointment of Senators by state executives during their legislatures' recesses--would have the same singular meaning.  Yet we know that is not so because in that latter context, the clause is used to refer collectively to the various recesses of the several state legislatures.  The Constitution also refers repeatedly to "the Congress" and "the President," yet I doubt the majority ascribes the same literal meaning to the definite article in these contexts.

Perhaps the Framers' use of the definite article has some unique meaning in this context, but there is nothing in the clause that points unambiguously to the majority's view of things.  It seems to me equally plausible that the Framers

---

[7] "[I]f Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies."  U.S. Const. art. I, § 3, cl. 2.

choice of words was intended to exclude other types of recesses--for example, when the Senate breaks for lunch by recessing. Alternatively, as the en banc Eleventh Circuit concluded in Evans, the word "the" might have also been intended to refer "generically to any one--intrasession or intersession--of the Senate's acts of recessing, that is, taking a break."  387 F.3d at 1225.

Furthermore, the majority's reading does more than simply give meaning to the word "the"--it also requires the court to inject an additional modifier into the Constitution, a practice that the Supreme Court has disfavored.  See The Pocket Veto Case, 279 U.S. 655, 679 (1929).  As Judge Greenaway notes in his dissent in New Vista, the majority's reading necessitates that one insert "intersession" before "Recess" in the clause.  New Vista, 2013 WL 2099742, at *34.  By contrast, a functional view of the clause does not require an additional modifier, because "the Recess" would refer without qualification to any break from Senate business when that body is functionally unavailable to give advice and consent.

The majority also concludes that because "adjourn" and "adjournment" are used elsewhere in the Constitution to refer to various types of congressional breaks, including intrasession recesses, "the Recess" must refer to a specific suspension of business: an intersession recess.  The majority is correct that

- 138 -

"adjourn" is used throughout the Constitution as a broader term than "the Recess." On that point, the Adjournments Clause of the Constitution demonstrates that an adjournment may either be very short--for example, a break from day to day--or much longer. See U.S. Const. art. I, § 5, cl. 4 (providing that "during the Session of Congress" neither House may "adjourn for more than three days" without the "consent of the other"). However, I fail to see how this fact logically leads to the conclusion that all intrasession breaks are excluded from "the Recess." The notion that the distinction between adjournments and "the Recess" applies with equal force to intra- and intersession recesses is a convenient correlation, but it has no basis in the text of the Constitution.

Nor does the balance of the clause shed further light on the question before us. The Employers argue that because the clause mandates that recess appointments expire at the end of Congress's "next session," the President's power to appoint necessarily must be limited to intersession recesses. Otherwise, they say, two recess appointees could have widely disparate tenures--that is, the President could appoint one official during an intrasession recess and another months later, during a subsequent intersession recess, yet both appointments would expire at the same time: the end of the next session.

But nothing in the Recess Appointments Clause requires that all recess appointments be of the same length, and such an interpretation does not further its purpose. "The check on the Recess Appointments Clause . . . is that recess appointments have a fixed end, not necessarily a fixed length." New Vista, 2013 WL 2099742, at *45 (Greenaway, J., dissenting). In that regard, I agree with Judge Greenaway that the Framers likely expected that recess appointments, even those made between sessions, would have varying durations, particularly given that intersession recesses in the nation's early years routinely lasted six months or longer. See id.

B.

Finding the clause's text inconclusive, I turn to consider its purpose. The Supreme Court has embraced this approach, often looking to the spirit and purpose of the language for guidance when constitutional text is ambiguous. See, e.g., Polar Tankers, Inc. v. City of Valdez, 557 U.S. 1, 6-7 (2009) (noting that "[t]he Court over the course of many years has consistently interpreted the language of the [Tonnage Clause] in light of its purpose . . . ."); Maryland v. Craig, 497 U.S. 836, 849 (1990) ("We have accordingly interpreted the Confrontation Clause in a manner sensitive to its purposes . . . ."); Tashjian v. Republican Party of Conn., 479 U.S. 208, 227 (1986) ("Our

inquiry begins with an examination of the Framers' purpose in enacting the first Qualifications Clause.").[8]

Although The Federalist Papers are indispensable in ascertaining many aspects of the Framers' intent and purpose, they reveal precious little about the Recess Appointments Clause, which was adopted without debate. It is undisputed, however, that the clause's purpose was to "establish[] an auxiliary method of appointment, in cases to which the general method was inadequate." The Federalist No. 67, at 409. The power was designed to work in concert with the Appointments Clause, which allows the President to fill vacancies with the advice and consent of the Senate.

Alexander Hamilton offered a succinct rationale for the recess appointment power, stating that "it might be necessary for the public service [for the President] to fill [vacancies]

---

[8] The Supreme Court also applied this functional approach in a case testing the meaning of the Pocket Veto Clause. See The Pocket Veto Case, 279 U.S. at 680. There, in considering whether the Senate was available to receive a bill from the President for the purposes of the Pocket Veto Clause, the Court eschewed a myopic focus on Congress's procedural status in favor of an analysis of the underlying purpose of the clause. See id. (holding that it was immaterial to whether the Senate had "adjourned" if it was a "final adjournment" or an "interim adjournment," and instead considering "whether [the adjournment] 'prevents' the President from returning the bill to the House in which it originated within the time allowed"). By ignoring procedural technicalities, the Court's interpretation upheld the purpose underlying the text and preserved the Framers' intended governmental structure.

without delay." Id. at 410. Such a view is consistent with the Executive's separate constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5, which in turn requires that the President have in place the principal officers necessary to carry out this mandate.

To that end, I submit that the Framers intended to place the power of appointment chiefly in the President. In The Federalist No. 76 for example, Hamilton explained that "one man of discernment is better fitted to analyze and estimate the peculiar qualities adapted to particular offices than a body of men of equal or perhaps even of superior discernment." The Federalist No. 76, at 455 (Alexander Hamilton) (C. Rossiter ed., 1961).

The Framers no doubt intended the Senate to play a significant role in the process, but its duty primarily was to ferret out appointments doled out based upon favoritism or corruption, and certainly not to weigh the executive's policy choice and impede the selection to an extent that risks shutting down entire agencies of the government. As Hamilton described it, "[The Senate] would be an excellent check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters from State prejudice, from family connection, from personal attachment, or from a view to popularity." Id. at 457; see also Myers v. United States, 272

U.S. 52, 118 (1926) (stating that the Senate's advice and consent role should be "strictly construed" and not "enlarged beyond words used").

Thus, while Hamilton described the recess power as an "auxiliary method of appointment," The Federalist No. 67, at 409, his broader view of the coordinate branches' respective roles in the process shows that the power was intended primarily for the President, and that the recess appointment power in particular was a practical aid in support of the President's constitutional obligations as the nation's chief executive.

Against this backdrop, I discern a meaning of "the Recess" that I believe would find favor with the Framers: the Senate is in "the Recess" when it is not available to provide advice and consent on nominations. Particularly, if the Senate is not engaged in its regular course of business, is unavailable to receive messages from the President, or cannot meet to consider a nominee for a position, it is in "the Recess." I note that this is not a test foreign to Congress; indeed the Senate Judiciary Committee long ago opined that "the Recess" denotes "a period of time when the Senate is not sitting in regular or extraordinary session . . . when its chamber is empty[,] when, because of its absence, it cannot receive communications from the President or participate as a body in making appointments." S. Rep. No. 58-4389, at 2 (1905).

My view of the clause thus does not distinguish between intrasession and intersession recesses, because such a distinction, while perhaps grist for wordsmiths, is meaningless in the context of the recess power's core purpose--to ensure the proper functioning of the government. Whatever label one chooses to affix to "the Recess," so long as the Senate is unable to provide its advice and consent on the President's nominees, the result is the same: important offices remain unfilled and the government does not function as intended.

## III.

The majority contends that its interpretation of the Recess Appointments Clause should be favored because it is consistent with the historical record. But a closer look at the conduct of the coordinate branches, both past and present, reveals that the functional approach not only fits with historical practice, but also better sustains the balance of powers inherent in our constitutional structure.

### A.

Relying on Noel Canning, the majority posits that "the infrequency of intrasession appointments in the historical record and the relative disdain harbored toward such appointments in at least the first 132 years of our Nation suggests an 'absence of [the] power' to make such appointments."

Maj. Op. at 99 (quoting Noel Canning, 705 F.3d at 502). In my view though, a functional interpretation of the Recess Appointments Clause properly counsels against a blind adherence to the precise procedural conditions in which earlier executives exercised the power. In any event, I do not think the majority's "use it or lose it" theory of constitutional interpretation is dispositive, particularly since the relevant history purporting to support it is not so compelling.

In the infancy of our republic, the Senate rarely took intrasession recesses, instead working steadily while in Washington and opting to take lengthy intersession recesses-- sometimes lasting six to nine months--to return home to family and constituents. See Congressional Directory for the 112th Congress 522-38 (2011). Travel for those early legislators was both arduous and treacherous, creating an additional disincentive to take additional breaks during a session. Thus, "until the Civil War, there were no intrasession recesses longer than 14 days, and only a handful that even exceeded three days." NLRB Supp. Br. 12 (citing Congressional Directory for the 112th Congress 522-25 (2011)).

The first time that Congress took an extended intrasession recess--from April 20, 1867 to July 3, 1867--President Andrew Johnson made the first known intrasession recess appointment. Edward A. Hartnett, Recess Appointments of Article III Judges:

Three Constitutional Questions, 26 Cardozo L. Rev. 377, 408-09 (2005). President Johnson made other intrasession recess appointments during his tenure, including one whose legitimacy was later challenged in--and upheld by--the Court of Claims.[9] Id. at 409 (citing Gould v. United States, 19 Ct. Cl. 593 (1884)).

As the country's transportation infrastructure improved substantially in the 20th century, it became easier for Senators to travel quickly and easily between the Capitol and their home states; this, in turn, has led to more intrasession breaks at the expense of the traditional extended intersession recess. Indeed, intrasession recesses today often last longer than intersession ones. See Evans, 387 F.3d at 1226 & n.10 (noting that the Senate has taken "zero-day intersession recesses" as well as "intrasession recesses lasting months"). The net result

---

[9] The majority is correct that the Senate took a number of intrasession recesses--typically around the Christmas holiday-- between 1867 and 1947, during which presidents did not make recess appointments. But the majority points to nothing in the historical record showing that the reason for this dearth of appointments was a concern as to the scope of the executive's recess appointment power. It appears, rather, that the record is silent on the question, although, as Judge Greenaway points out in his dissent in New Vista, one possible explanation is that "intersession recesses [during that period] were still rather lengthy, often spanning several months, which gave the President ample time to make recess appointments during intersession recesses, compared to the relatively short duration of early intrasession recesses." New Vista, 2013 WL 2099742, at *46 (Greenaway, J., dissenting).

is that in modern Senate practice, intrasession recesses account for more of the Senate's absences than intersession recesses. See Congressional Directory for the 112th Congress 530-37 (2011).

I therefore attach little, if any, negative constitutional significance to the historical fact that since 1947, presidents from both parties have made over 400 intrasession appointments. See New Vista, 2013 WL 2099742, at *44 (Greenaway, J., dissenting). Yet the majority's fixation on bygone history--at the expense of the reality that informs recess appointment practices today--effectively deems every single one of those appointments to be constitutionally infirm.

I do not suggest that history should be ignored as a tool of constitutional interpretation. But one need only read the fine briefs in these cases to recognize that, given time, savvy lawyers can excavate historical references to support virtually any proposition.[10] Compare NLRB Supp. Br. 9 (noting that George

_____

[10] The same holds true for any attempt to divine an answer to the questions before us by relying on dictionary definitions of the day. Compare Evans, 387 F.3d at 1226 (citing dictionaries that define "happen" in the recess appointment clause as "to happen to be") with id. at 1230 n.4 (Barkett, J., dissenting) (citing dictionaries that define "happen" as "to occur"). Indeed, the parties' resort to historical and dictionary references here is "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." Conroy v. Aniskoff, 507 U.S. 511, 519 (1993) (Scalia, J., concurring).

Washington once referred to an intrasession break as "the recess" in a letter to John Jay), and NLRB Supp. Br. 9 (arguing that the eighteenth-century Pennsylvania and Vermont state constitutions supported the "intrasession" definition of "recess"), with Resp'ts' Supp. Br. 14-15 (citing Judge Barkett's dissent in Evans in which she notes George Washington's reference to an intersession break as "the recess" in a message to Congress) and Resp'ts' Supp. Br. 15 (arguing that the Massachusetts and North Carolina state constitutions supported the "intersession" definition).

Rather than impute dubious meaning to sparse text or ascribe consistency to what is, at best, ambiguous historical practice, I would look to the purpose of the clause as our lodestar. To that end, we would do well to remember that

> [t]ime works changes, brings into existence new conditions and purposes. Therefore, a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice John Marshall, 'designed to approach immortality as nearly as human institutions can approach it.' The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been, but of what may be.

Weems v. United States, 217 U.S. 349, 373 (1910) (quoting Cohens v. Virginia, 19 U.S. 264, 387 (1821)).

Viewed in this practical light, the Recess Appointments Clause sheds the ambiguity of its text in favor of a meaning that promotes its core function. I would therefore hold that "the Recess" refers to recesses generally, no matter the type, as long as the Senate is not engaged in its regular business and is unable to perform its constitutional duty of providing advice and consent on the President's nominees.

## B.

Admittedly, a functional view of the President's recess appointment power does not fix a minimum length for the Senate's break in business to constitute "the Recess." But the majority's own reading of the clause fares no better. Under its interpretation, "the Recess" authorizing the President to act occurs only when Congress breaks between sessions, without regard to whether the break spans weeks, days, or hours. Thus, if Congress takes a one-day break between sessions, the majority apparently would find no fault with the President making a recess appointment during that time, despite the fact that the Senate would have returned to business the next day and been available to provide its advice and consent on the nominee.

Nor would the majority's interpretation prevent the President from making hundreds of recess appointments during a momentary intersession recess. Indeed, I note with some irony that the sole instance in which a President assumed such

audacious power occurred in 1903 when President Theodore Roosevelt "used a moment's intersession recess . . . to make 193 executive branch appointments, literally between two raps of a gavel." Peter M. Shane, Third Circuit Further Fuels the Constitutional Conflict Over Recess Appointments, U.S. Law Week, June 11, 2013. The majority's decision today would do nothing to stop a future President from channeling the Rough Rider.

Certainly, we should not ignore the possibility that the President might abuse his power to appoint officials in the manner suggested by the Employers here. But the majority appears eager to assume the worse from the nation's chief executive. I, for one, decline to "imput[e] to the President a degree of turpitude entirely inconsistent with the character which his office implies, as well as with the high responsibility and short tenure annexed to that office." Allocco, 305 F.2d at 714 (quoting Exec. Auth. to Fill Vacancies, 1 Op. Att'y Gen. 631, 634 (1823)). After all, "[t]here is [also] no text limiting the laws a President may veto (or his reasons for vetoing them), the pardons he may issue, or the occasions on which he may convene Congress on his own initiative." Shane, Third Circuit Further Fuels the Constitutional Conflict Over Recess Appointments, U.S. Law Week, June 11, 2013. We should nonetheless expect some modicum of good faith in the individual our fellow citizens elect to the

- 150 -

most powerful office in the world, otherwise his "textual powers are quite adequate, if asserted irresponsibly, to undermine both Congress and the judiciary."  Id.

In any event, there are checks in our constitutional structure, both explicit and implicit, that protect against just such abuse.  To begin with, the President may make recess appointments only when the Senate is not in session for regular business.  If the Senate wishes to give its advice and consent as to particular nominees, it may remain in regular session for that purpose.  Second, the very fact that all recess appointments are temporary restrains the President's power.  Third, the President has a substantial interest in obtaining the Senate's advice and consent for full terms for the principal officers he nominates to implement the administration's agenda, rather than relying on short-term recess appointees.  Fourth, as Judge Greenaway notes in his dissent in New Vista, "the structure of the branches of government, as conceived by the Constitution, give[s] the President a very strong interest in maintaining the favor of the Senate and not stoking its ire." New Vista, 2013 WL 2099742, at *41. (citing The Federalist No. 77, at 459 (Alexander Hamilton) (C. Rossiter ed., 1961)).[11]  The

_____

[11] It appears that President Obama has acknowledged and respected this interest, given that he has made but thirty-two recess appointments while in office.  In contrast, his two (Continued)

- 151 -

President also must consider public opinion, as an executive who abuses his power will damage his reputation, as well as that of his party.  See id.

The majority also gives short shrift to the fact that the President too swears an oath to uphold the Constitution, and that when he acts under its express authority, his actions should be accorded a presumption of constitutionality.  See Evans, 387 F.3d at 1222 (citing United States v. Nixon, 418 U.S. 683 (1974)).  The Supreme Court has further underscored the necessity of the legislative branch providing some latitude to the President in his use of constitutional authority, admonishing that congressional action is invalid if it "undermine[s] the powers of the Executive Branch, or disrupt[s] the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions."  Morrison v. Olsen, 487 U.S. 654, 658 (1988) (citations and internal quotations omitted).

But the more direct response to the claim that the functional view fails for lack of temporal limits is, so what?  Limiting principles are important when courts engage in

immediate predecessors made 310 such appointments.  Henry Hogue, Cong. Res. Serv., Recess Appointments:  Frequently Asked Questions (Jun. 7, 2013).

constitutional interpretation, but a slavish devotion to them at the expense of common sense is no virtue. That the Framers chose not to draw a bright line delineating the limits of the President's recess appointment power is not a flaw, but rather a part of their grand design in drafting a compact "intended to endure for ages to come, and consequently to be adapted to the various crises of human affairs." McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 415 (1819).

In short, because any fixed time limitation has no basis in the text of the clause, it would perforce be arbitrary. See New Vista, 2013 WL 2099742, at *44 (Greenaway, J., dissenting). The proper test in assessing whether a "Recess" triggers the President's power to appoint is whether the Senate is engaged in its regular business and thus available to give its advice and consent: this inquiry operates to exclude the altogether silly scenario of the President making recess appointments during the Senate's breaks for meals or weekends, while including the types of weeks-long intrasession recesses that could stall the functioning of government if an important post is left vacant.

As the majority would have it, the Senate is free to read out of the Constitution the President's recess appointment power by refusing to take intersession recesses, opting instead to take an extended intrasession break, returning just before the session ends, and then moving directly into the next session.

Even though the harm to the country of leaving vital offices unfilled while the Senate is away and unable to give advice and consent is no less compelling in this scenario, the President would be powerless to act. The Supreme Court has long made clear, however, that no clause should be interpreted in a manner that would render it meaningless. See Marbury v. Madison, 5 U.S. 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect . . . .").

This concern is far from hypothetical, as the NRLB's history of vacancies demonstrates. Despite nominations made by Presidents of both parties, the NLRB has not had a full panel of Senate-confirmed members since 2003, a problem exacerbated by the Supreme Court's decision in New Process Steel LP v. NLRB, 130 S. Ct. 2635 (2010), which held that the Board must have at least three members in order to constitute a quorum for purposes of resolving unfair labor practice charges. Board Member and Chairman Mark Gaston Pearce's term will expire in August of this year, see 29 U.S.C. § 153(a),[12] leaving the Board again without a quorum unless the President's nominees are confirmed by the Senate. It is this precise scenario, that is, where an appointment vacuum (whatever its origins) impedes the enforcement of a statute--in these cases one designed "to

_____

[12] Mark Gaston Pearce, NLRB.gov, http://www.nlrb.gov/who-we-are/board/mark-gaston-pearce-chairman.

protect the rights of employees and employers, to encourage collective bargaining, and to curtail certain private sector labor and management practices, which can harm the general welfare of workers, businesses and the U.S. economy,"[13]--that the President's recess appointment power was designed to remedy.

To make matters worse, while the majority claims that its reading simply restores the Senate's power in the appointments process, it actually gives the House of Representatives a de facto veto on presidential recess appointments. The Adjournments Clause provides that neither House of Congress may adjourn for more than three days without mutual consent. See U.S. Const. art. I, § 5, cl. 4. Its purpose is to allow the business of Congress to be conducted by preventing either House to adjourn for an extended period without the other's consent. But these appeals are before us precisely because the House has wielded this power in part to block intrasession recess appointments by refusing to adjourn, thereby forcing the Senate to rely on pro forma sessions to allow its members to break for significant periods of time. See New Vista, 2013 WL 2099742, at *32 n.6 (Greenaway, J., dissenting).

Under the majority's holding, the House has effectively gained a check on the President's appointment power, a

---

[13] National Labor Relations Act, NLRB.gov, http://www.nlrb.gov/national-labor-relations-act.

proposition neither contemplated by the Constitution nor intended by the Framers. See id. at *34 (stating that the House should not "interfere with the appointments process because '[a] body so fluctuating and at the same time so numerous can never be deemed proper for the exercise of that power'") (quoting The Federalist No. 77, at 463 (Alexander Hamilton) (C. Rossiter ed., 1961))).

The majority contends that the President may override this House "veto" by invoking his power to force an adjournment of Congress, thus creating an intersession recess during which he could make appointments. See U.S. Const. art. II, § 2, cl. 3; Todd Garvey et al., Cong. Res. Serv., The Recess Appointment Power After Noel Canning v. NLRB: Constitutional Implications (Mar. 27, 2013). It appears, however, that no President has ever exercised this power, and it is unclear how it would be determined that the House and Senate are truly in "disagreement . . . with respect to the Time of Adjournment." In any event, I confess to some surprise that the majority has taken this tack, as it runs counter to their view of the President's authority in two ways: First, it would allow the President to decide when the Senate is in "the Recess," thereby granting the President the precise unilateral power of appointment that the majority finds objectionable. Second, given the majority's clear distinction between an "adjournment" and "the Recess," see Maj.

Op. at 93-94, even if the President forced an adjournment of Congress, presumably the majority would not countenance the President's use of the recess appointment power during the resulting break.

The majority also claims that the functional approach interferes with the Senate's ability to regulate its own procedure. Not so. My reading of the Recess Appointments Clause would not prevent the Senate from engaging in any practice, including its use of pro forma sessions. Indeed, I recognize that such practices may be necessary for the Senate to conform to the requirements of the Adjournments Clause. But "[t]he Senate cannot be both unavailable and yet force the President to submit to its advice and consent." New Vista, 2013 WL 2099742, at *42 (Greenaway, J., dissenting). Put another way, we should not allow the Senate to determine the effect of such actions on a coordinate branch. Rather, while the Senate may meet in pro forma sessions when its members see fit, the President may also choose to use his recess appointment power during such sessions if the Senate is practically unavailable to provide its advice and consent for nominees.

Finally, I find no merit to the Employers' argument that the Senate was, in fact, available to provide advice and consent during the relevant period due to its passing the payroll tax extension legislation on December 23, 2011. To begin with,

- 157 -

Congress began a new session on January 3, 2012, and therefore this legislative action took place during a different intrasession recess than the one in which the President made his appointments. Thus, even assuming that the Senate had been available during the December intrasession recess, that fact has no bearing on whether it could act on a nomination during a subsequent break. Second, the payroll tax extension was an extraordinary bill that was part of a broader legislative effort to avert a national financial catastrophe, and was passed by unanimous consent, thus not requiring the Senate to return to Washington. See 157 Cong. Rec. S 8789-03 (daily ed. Dec. 23, 2011) (statement of Sen. Harry Reid). By contrast, nominees to offices like the Board are typically subject to a confirmation hearing, followed by a vote. Considering the time and attention typically given to presidential nominees, it was reasonable for the President to assume that the Senate could not practically give its advice and consent to nominations during pro forma sessions in which (1) a lone senator gaveled the body to order for sessions lasting no more than a few minutes, (2) the Senate could not receive messages from the President, (3) no debates were held, and (4) no speeches were made. See New Vista, 2013 WL 2099742, at *32 (Greenaway, J., dissenting) ("While courts have not had occasion to articulate a standard for advice and

consent, it is clear . . . that provision of advice and consent cannot be perfunctory.").

C.

Under a functional interpretation of the Recess Appointments Clause, the Senate's intrasession break during January 2012 qualifies as "the Recess." The Senate had adopted a no-business order, 157 Cong. Rec. S 8783-07 (daily ed. Dec. 17, 2011), instead holding pro forma sessions wherein the Senate was not engaged in regular business, and thus was unable to provide its advice and consent on any nominations that the President may have presented. Therefore, I would hold that the intrasession recess from January 3, 2012, to January 23, 2012, constituted "the Recess" for purposes of the Recess Appointments Clause.

IV.

Next, I consider the Employers' contention that a vacancy must arise during the recess in order for the President to use his recess appointment power to fill it. Because it found the interpretation of "the Recess" to be dispositive, the majority did not reach this issue.

The Employers argue that the appointments of Members Block, Flynn, and Griffin are invalid because the relevant vacancies did not arise during "the Recess of the Senate." According to

the Employers, to be filled by a recess appointment, a position must be vacated during the recess--that is, the President cannot use his power during the recess to fill a vacancy that arose while the Senate was still in session. For this proposition, the Employers rely on the Noel Canning opinion, wherein the court concluded that the plain language and history of the clause shows that "may happen" means "may arise" and is modified by "during the Recess of the Senate." Noel Canning, 705 F.3d at 507-12).

The Board, on the other hand, claims that the clause places no such restriction on the President's power. In its view, "may happen" means "may exist," and therefore the President may use his authority to make recess appointments to any vacant position while the Senate is in recess. Because both the text and the purpose of the clause support its interpretation, I agree with the Board.

If "during the Recess of the Senate" modifies "may happen," as the Employers assert, then the clause would allow the President to make recess appointments at any time, even while the Senate is in session, as long as the vacancy first arose during a recess. In effect, one would have to read "during the Recess of the Senate" twice to give the clause the Employers' preferred meaning: once to denote when the vacancy must arise, and once again to limit when the President may exercise his

recess appointment power. I decline to give the text of the clause such a convoluted meaning. See Woodley, 751 F.2d at 1012 (noting that the "may arise" interpretation "conflicts with a common sense reading of the word happen, as well as the construction given to this word by the three branches of our government").

The Board's interpretation, by contrast, flows from a plain reading of the text. Reading "may happen" to mean "happen to exist," one need only read "during the Recess of the Senate" once in order to reach the traditional understanding of when the President may make recess appointments.

The D.C. Circuit in Noel Canning disagrees with this reading, concluding that it renders "the operative phrase 'that may happen' wholly unnecessary." 705 F.3d at 507. That is incorrect. Were the clause to read "[t]he President shall have Power to fill up all Vacancies during the Recess of the Senate," it would imply a much broader power than the Framers intended, suggesting that the recess appointment power was on equal par with that given in the Appointments Clause. The inclusion of "that may happen" makes clear that the power is not intended to be the default method of appointment, but is rather an auxiliary to be used when vacant positions could not, for some reason, be filled during the session.

Nor is the clause's purpose served by limiting the President's appointment authority to those vacancies that arise during a recess. It bears repeating that the Recess Appointments Clause serves to maintain a functioning government at times when the Senate is unavailable to provide its advice and consent for a nominee. As a practical matter, when a vacancy arises, the President and his advisors may take a significant amount of time to select and vet a candidate before officially presenting the nominee to the Senate. At times, this period may be longer than that which remains before the Senate's recess.

Such was the case in Allocco, 305 F.2d 704, when a judicial vacancy arose on July 31, 1955, and the President was unable to fill the position before the Senate adjourned three days later. The court there held that the President's recess power extended to all vacancies, regardless of when they arose, relying in part on "a long and continuous line of opinions" by the Attorneys-General of the United States, beginning in 1823, advising the President "the recess power extends to vacancies which arise while the Senate is in session." Id. at 713.

But under the Employers' interpretation, the President could not temporarily appoint an official to an important government post, even if the vacancy arose the day prior to the Senate's recess, and even if the recess were expected to last

for weeks or months.  "It is inconceivable that the drafters of the Constitution intended to create such a manifestly undesirable situation."  Allocco, 305 F.2d at 710.  Rather, the public interest lies in maintaining a functioning government, and the Board's interpretation of the clause effects that very purpose.  See Evans, 387 F.3d at 1227 ("[I]nterpreting the phrase to prohibit the President from filling a vacancy that comes into being on the last day of a Session but to empower the President to fill a vacancy that arises immediately thereafter (on the first day of recess) contradicts what we understand to be the purpose of the Recess Appointments Clause: to keep important offices filled and the government functioning.").[14]

This understanding of the recess appointment power has been espoused by every Attorney General confronted with the question since 1823, when Attorney General William Wirt advised President Monroe that the clause extended to all vacancies that exist

---

[14] Congress has effectively acquiesced in the Board's reading of the clause.  The Pay Act, originally enacted during the Civil War and currently codified as 5 U.S.C. § 5503, provides for the payment of salaries to recess appointees who fill vacancies that first arise while the Senate is in session. Although the act originally postponed salaries to these appointees, Act of Feb. 9, 1863, ch. 25 § 2, 12 Stat. 642, 646, Congress subsequently amended it to permit them to be paid under certain conditions, see Act of July 11, 1940, 54 Stat. 751.  In passing a law that regulated the salaries of these appointees-- even if its terms display an aversion to the practice--Congress acknowledged that it was within the President's constitutional authority to make recess appointments to pre-existing vacancies.

during a recess, including those that arose beforehand.  See,
e.g., <u>Exec. Auth. to Fill Vacancies</u>, 1 Op. Att'y Gen. 631
(1823); <u>President's Power to Fill Vacancies in Recess of the
Senate</u>, 12 Op. Att'y Gen. 32 (1866); <u>Appointments Made During
the Recess of the Senate</u>, 16 Op. Att'y Gen. 522 (1880).[15]
Furthermore, until this year, every circuit court to have
considered this issue has endorsed that interpretation.  <u>See</u>
<u>Evans</u>, 387 F.3d at 1226-27 (en banc); <u>Woodley</u>, 751 F.2d at 1012-
13 (en banc); <u>Allocco</u>, 305 F.2d at 709-15.

The sole outlier is <u>Noel Canning</u>.  But the D.C. Circuit's
reasoning, in addition to running counter to nearly two hundred
years of precedent and distorting the text of the clause, is
squarely at odds with the clause's purpose.  As one scholar
aptly notes, "[i]f the [P]resident needs to make an appointment,

---

[15] One earlier opinion, from Attorney General Edmund
Randolph, endorses the "happen to arise" interpretation.  <u>See</u>
Edmund Randolph, <u>Opinion on Recess Appointments</u> (July 7, 1792),
<u>in</u> 24 The Papers of Thomas Jefferson 165, 165-67 (John
Catanzariti ed., 1990).  However, as the Board points out, not
only has that reading been repudiated by the long line of
subsequent Attorneys-General opinions, but it is not clear that
any President found it persuasive.  Even George Washington, to
whom the opinion was addressed, appeared to reject the
interpretation when he appointed William Clarke to be U.S.
Attorney for Kentucky and Robert Scot to be the first Engraver
of the Mint--both to vacancies that arose prior to the Senate's
recess.  <u>See</u> S. Exec. J., 4th Cong., 2d Sess. 217 (1796);
Tachau, Federal Courts in the Early Republic: Kentucky 1789-
1816, at 65-73 (1979); 27 The Papers of Thomas Jefferson 192
(John Catanzariti, ed. 1990); S. Exec. J., 3d Cong., 1st Sess.,
142-43 (1793).

and the Senate is not around, <u>when</u> the vacancy arose hardly matters; the point is that it must be filled now." Michael Herz, <u>Abandoning Recess Appointments?: A Comment on Hartnett (and Others)</u>, 26 Cardozo L. Rev. 443, 445-46 (2005) (emphasis added).

Finding that both text and purpose support the Board's view, I conclude that "may happen" means "may exist" in the context of the Recess Appointments Clause. Therefore, the President's recess appointments to the NLRB are valid, despite the fact that the vacancies first arose prior to the recess of the Senate.


V.

The constitutional questions before us are vexing ones, and I respect deeply my colleagues' good faith effort to resolve them. The majority's interpretation of the Recess Appointments Clause attempts a literal reading of the text, which it endeavors to bolster by reviewing the manner in which it claims the power was exercised during the first half of our democracy. But I can divine no textual clarity in the words of the clause, and the history of its use is muddled at best.

The majority's view also ignores the modern recess practices of the Senate, wherein intrasession recesses have become the norm, and does violence to the fundamental purpose of

the recess appointment power--to allow the President to fill up important offices and keep the government functioning.  Worse, it grants the House a veto over recess appointments, a power nowhere to be found in the Constitution, and grants the Senate-- through the use of a procedural artifice unworthy of the world's greatest deliberative body--unfettered power to prevent the President from making recess appointments to fill up important offices.    Indeed,  the  majority's  reading  tilts  our constitutional separation of powers far out of balance, according excessive leverage to the Congress in the appointment of government officials, at the expense of the President's constitutional prerogative to choose those he or she deems best fit to aid in taking care that the laws be faithfully executed. It is a reading contrary to the Framers' intent.

Under the functional interpretation of the Recess Appointments Clause that I propose, the Senate's break from January 3 to January 23, 2012, was--<u>pro forma</u> sessions notwithstanding--"the Recess" for the purposes of the President's recess appointment power because the Senate was not then available to give its advice and consent.  In my view, the plain language of the clause and its fundamental purpose allow the President--as he has done here--to fill up all vacancies then-existing during the Recess.

On this reasoning, I would uphold the President's appointments of Members Block, Flynn, and Griffin to the NLRB and would affirm the Board's decisions in these appeals.

I respectfully dissent from parts IV and V of the majority opinion.